FILED
United States Court of Appeals
Tenth Circuit

May 3, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

     Plaintiff-Appellant,

v.

PAUL OTHELLO SMALLS,

     Defendant-Appellee.

No. 09-2126

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 06-CR-2403-RB)**

---

Richard C. Williams, Assistant United States Attorney (Gregory J. Fouratt, United States Attorney, with him on the brief), Las Cruces, New Mexico, for Plaintiff-Appellant.

Jerry Daniel Herrera, Albuquerque, New Mexico, for Defendant-Appellee.

---

Before **KELLY**, **BALDOCK**, and **HOLMES**, Circuit Judges.

---

**BALDOCK**, Circuit Judge.

---

Where a declarant is unavailable to testify at trial, Fed. R. Evid. 804(b)(3) provides for the admissibility of "[a] statement which . . . at the time of its making . . . so far tended to subject the declarant to . . . criminal liability . . . that a reasonable person in the declarant's position would not have made the statement

unless believing it to be true." The issue in this interlocutory appeal, presented to us pursuant to 18 U.S.C. § 3731, is whether the district court abused its discretion in excluding as inadmissible hearsay, and thus as outside the scope of Rule 804(b)(3), the entirety of an accomplice's nontestimonial statement to a fellow inmate implicating the accomplice and Defendant Paul Othello Smalls in a murder. In holding that the district court abused its discretion, we remain mindful that "[t]he question under Rule 804(b)(3) is *always* whether the statement was *sufficiently* against the declarant's penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true,' and this question can only be answered in light of all the surrounding circumstances." Williamson v. United States, 512 U.S. 594, 603–04 (1994) (emphasis added).

## I.

Philip Gantz was assisting federal drug enforcement officials in their investigation of narcotics trafficking in Roswell, New Mexico. Prison officials at the Doña Ana County Detention Center in Las Cruces, New Mexico, found Gantz dead in his four-man overflow "cell" within the medical unit on the morning of December 30, 2004. Gantz shared the unit with fellow detainees Glenn Dell Cook, Walter Melgar-Diaz, and Defendant Smalls. Following an investigation, a federal grand jury indicted the three men on one count of retaliating against an informant and one count of conspiracy to commit the same in violation of 18 U.S.C. § 1513, one count of tampering with an informant and one count of conspiracy to commit the

2

same in violation of 18 U.S.C. § 1512, and one count of killing a person aiding a federal investigation in violation of 18 U.S.C. § 1121. The indictment alleged Defendant Smalls "held Gantz's legs down," Cook "held Gantz's arms and torso down," and Melgar-Diaz "held a plastic bag over Gantz's face," together resulting in Gantz's death by strangulation.[1] Aplt's App. vol. I, at 41. After the Government indicated it would not seek the death penalty, Melgar-Diaz pleaded guilty under a sealed plea agreement. The district court severed the trials of Defendant Smalls and Cook as a result of an out-of-court statement Cook made to a confidential informant (CI), also an inmate at the detention center, implicating both himself and Defendant Smalls in the murder.[2]

---

[1] An autopsy "determined that the death was caused by strangulation, specifically by pressure being placed on Mr. Gantz's neck, cutting off blood flow to his brain. Dr. Nine, a pathologist at the Office of the Medical Investigator, opined that more than one person would have been required to kill Mr. Gantz." Aplt's App. vol. I, at 116; vol. II, at 290.

[2] Although the district court's severance order is not part of the record on appeal, we take judicial notice of it under Fed. R. Evid. 201 as it appears of record in United States v. Smalls, No. 06-CR-2403-RB-1, Memorandum Opinion and Order (D.N.M. May 7, 2008) (Doc. # 280). Relying on Bruton v. United States, 391 U.S. 123 (1968) and its progeny, the district court reasoned the admission into evidence of a recorded statement in which Cook incriminated both himself *and* his alleged cohorts before a CI would violate Defendant Smalls' right to confrontation. In Bruton, the Court held that defendant was deprived of his Sixth Amendment right to confrontation where his accomplice's confession, made to a postal inspector during an interrogation, was introduced at their joint trial. The Court explained that a limiting jury instruction was insufficient under the facts of the case to cure any prejudice to that defendant. As will become apparent from our opinion, Bruton is consistent with the present state of Sixth Amendment law because the accomplice's confession, unlike Cook's statement, was testimonial, rendering it inadmissible

(continued...)

3

Prior to the indictment, CI had informed investigators that he spoke with Cook on more than one occasion about Gantz's murder. Cook told CI that he, Defendant Smalls, and Melgar-Diaz had murdered Gantz. According to the district court: "[CI] stated that Mr. Cook constantly talked about the murder over a two-month period and finally told him the whole story. Defendant Cook told [CI] that they killed Mr. Gantz because he was a snitch." United States v. Cook, No. 06-CR-2403-RB-2, Sealed Findings of Fact and Conclusions of Law and Order Granting Motion to Suppress, at 2 (D.N.M. Sept. 29, 2008) (Doc. # 438), rev'd, __ F.3d __, 2010 WL 1268529 (10th Cir. 2010).[3] Agents subsequently fitted CI with a recording device and placed him in a cell alone with Cook, who at the time was awaiting sentencing on an unrelated drug conviction. At the behest of agents, CI engaged Cook in conversation by mentioning to him a recent newspaper article about an FBI investigation into Gantz's murder. When CI expressed concern that someone

---

[2](...continued)
against the defendant absent an opportunity for cross-examination. Notably, however, the Bruton rule, like the Confrontation Clause upon which it is premised, does not apply to nontestimonial hearsay statements. See infra Part II.A. & B.; see also United States v. Johnson, 581 F.3d 320, 326 (6th Cir. 2009), petition for cert. filed, No. 09-8948 (Feb. 2, 2010); United States v. Avila Vargas, 570 F.3d 1004, 1009 (8th Cir. 2009).

[3] The district court's suppression order is part of the record on appeal, Aplt's App. vol. I, at 116, but page two of that order has been omitted inadvertently. Thus, we take judicial notice under Fed. R. Evid. 201 of that omitted portion of the record.

4

involved in the murder might "flip," the following exchange occurred:[4]

COOK: Yeah, but you know what though nigger, . . . that's the easiest case to beat right now dog. I'd rather have that than this case [*i.e.*, drug conviction] I got.

[CI]: But you sure ain't nobody can't say nothin'?

COOK: Naw! If they do, we all involved, homie. That's the good thing. It ain't like just one of us...

[CI]: No, I'm sayin' what happened?

COOK: We killed the mother fucker.

[CI]: No, I'm sayin' well how did this whole shit just go down, my man?

COOK: Oh, cause he was snitchin', homie.

[CI]: Who was the ring leader?

COOK: The Mexican dude [*i.e.*, Melgar-Diaz].

[CI]: So the Mexican dude...plotted everything.

COOK: (UI [unintelligible], voices overlap)

[CI]: Or was it even plotted?

COOK: Really, it wasn't even no plot, homie. It's like this nigger snitched, naw. Everybody around him, you wussy, he was what, what, what...so you know how we'd planned...

[CI]: Yeah.

COOK: ...you know how me and you (UI ) pushin' (UI)...me and "D" talkin' about let's get this, let's get the bag on this nigger.

[CI]: Yeah.

COOK: So we had a bag...so we was like what ya'll wanna do? I'm all hell I, everybody like fuck, come on. We was just playin' really right...we was like one, two, three, go. Put it over his head homie and, and come out to be a...and then it come out to be a mother fuckin' murder, homie

[CI]: So ya'll put the bag over his head?

COOK: (laughing)

[CI]: Who put the bag over the head?

--------

[4] The excerpts are from a transcription of the recorded conversation between CI and Cook. Excepting the spaced ellipses, bracketed materials, and tri-starred breaks, the excerpts are reproduced as they appear in the transcript, which is found in duplicate in the record. See Aplt's App. vol. I, at 50-73; vol. II, at 265-288. The sound recording, also a part of the record, is consistent with the transcription.

5

COOK: The Mexican dude.

[CI]: And what'd you do?

COOK: Held his hands.

[CI]: And what did the black dude [*i.e.*, Defendant Smalls] do?

COOK: He held his feet.[5]

* * *

[CI]: Was it a hit, dog?

COOK: Like a...grudge (UI)?

[CI]: Yeah.

COOK: Yeah real, I mean...alright, look, this is what it was...see the Mexican...the Mexican, it had been a big thing with the Mexicans cause he'd been on PC [protective custody]...it, all the Mexicans been tryin' to get in the room on him.

[CI]: So what, he told on somebody then...

COOK: Yeah. He told on that nigger that shot that little kid.

[CI]: Oh!

COOK: 'member?

[CI]: Yeah. The cat "Di" stomped on.

COOK: Yeah!

[CI]: Alright. Alright.

COOK: See he told on them so there's been a big hit for the last year or something on him. That's why they wouldn't take a trip 'cause they know he'd been in PC all, all snitch status.

[CI]: Did the black dude know that?

COOK: We all knew that. Nurses...everybody in P...everybody in, in the, in the, in the, in the whats–a–thing knew... everybody in medical knew.

---

5  According to the district court:

There were only four individuals in the locked cell: the white man who died, a Hispanic man, Mr. Melgar-Diaz, and two black men, Mr. Cook and Mr. Smalls. The statement referring to "the black dude" was made by Mr. Cook. Although the statement does not implicate Mr. Smalls on its face, because the only other black man in the cell was Mr. Smalls, the reference to "the black dude" could only mean Mr. Smalls.

Smalls, No. 06-CR-2403-RB-1, Memorandum Opinion and Order dated May 7, 2008, at 11–12.

* * *

[CI]:      Yeah.  So really nobody can't say nothin'...
COOK:      Nah huh...
[CI]:      ...cause everybody took part in the murder.
COOK:      Yeah, that's why I ain't worried.  I could see if I was the only one, or he was the only one, but he, we all had something to do with it, so we all can't say nothin'.  And they can't...I'm gonna tell you now, homie...they, they don't, they, even if the feds do pick it up, they ain't got enough evidence to get it through ju...grand jury.
[CI]:      Sure don't, they need somebody help.
COOK:      They ain't got, they, grand jury got to have something off the top first.  They ain't got no weapon...they ain't got nobody sayin' nothin'...they ain't got no ev...they ain't got nothin ho...
[CI]:      That's my idea see, so they still gotta come up with more than that.
COOK:      Yeah.  They still gotta, they gotta come with the whole nine on this shit.  And see right now they's looking toward the Mexican, that's why I ain't gonna say nothin'.
[CI]:      Mmm hmm.
COOK:      I'm already knowin' it's lookin' toward him 'cause if the Mexicans involved he snitch on, that's what the detectives told me.  We know you ain't got nothin' to do with it, but just tell us what happened.  I ain't telling ya'll shit, I ain't had nothin', I don't know what happened.  That's my story and I'm stickin' to it, all the way to the end, homie.  I ain't even gonna make up no stories no more.
                              * * *
[CI]:      What you gonna say, what you gonna say just in case they indict your ass, bro.  What you gonna say to your lawyer?  Cause it's what you say to your lawyer they really, you know what I'm sayin'?
COOK:      I don't know, I ain't gonna say nothin'.  I'm gonna tell him the same thing I told them [the detectives].  Man if anything happened to that dude, I was asleep.  So he ain't gonna have nothin' to run on me.  If he ever try to go behind my back, he couldn't.
                              * * *
COOK:      They can't do nothin'.
[CI]:      ...I mean...not unless you talk to somebody.

7

COOK:      They can't do nothin', homie.

[CI]:      You ain't told nobody about it?

COOK:      I ain't told nobody but ya'll. Ya'll are the only people, homie...and, and, and, and to tell you the truth, I ain't did nothin' (laughs).

[CI]:      (UI, voices overlap)

COOK:      (laughing) So, so shit. I don't give a fuck what they say.

[CI]:      And you're sure that, that black guy got rid of the bag?

COOK:      Hell, I got rid of the mother fucker.

[CI]:      You got rid of the bag?

COOK:      (makes noise to simulate toilet flushing)

[CI]:      Okay.

COOK:      Down in the toilet. If they wanna (UI, voices overlap)

[CI]:      You're positive?

COOK:      I know. I sat there and watched the mother fucker go. And it blew up. You know how it, the bag blew up...

[CI]:      Yeah, yeah the air.

COOK:      ......it blew up. It blew up, and I hit him again. (simulates punching noise)...stuffed it down in there...and got rid of it. Boom, it's gone. They ain't got nothin'...the only the thing now, it's gettin' hectic 'cause, 'cause if momma don't fittin' to get that money, homie. That's why.

* * *

COOK:      But, see I'm gonna tell you like this though...they can't really...if it was to make it to trial, homie...for the simple fact they...it, when it, when it first happened, they said it was ah...ah...he died of a asthma attack.

[CI]:      Mmm hmm.

COOK:      Okay, so if he died of a asthma attack...that's what the, any lawyer that's gonna be half way decent gonna hit him off with, did he struggle? He had no struggle in him...he had no noth...'member I told you about that?

* * *

COOK:      They ain't got nobody, if they never did anything, they would be gettin' on the stand on me.

[CI]:      Yeah.

COOK:      They can't, 'cause if they do, you...okay, if that's 'cause I did, then you did this, and we....okay, so what?

[CI]:      Yeah, everybody had a part.

COOK:      Yeah, so then what? Can't nobody just get up there and say no, he did it.

8

| | |
|---|---|
| [CI]: | Yeah. |
| COOK: | Plus they ain't gonna do it anyway, homie. |
| [CI]: | Now, if there's a trade off... |
| COOK: | No... |
| [CI]: | And see the Mexican, he actually, you know what I'm sayin', put the bag over the head... |
| COOK: | Yeah. |
| [CI]: | ...and you helped holdin' on so... |
| COOK: | Yeah. So I'm justa accessory anyway. But ain't nobody gonna say nothin' I ain't gonna worry about that shit, dog (UI, voices overlap). |

* * *

| | |
|---|---|
| COOK: | But what can they do? . . . They can't do nothin'. That was a clean one right there. That's what you call clean, homie. |
| [CI]: | You sure, right... |
| COOK: | Clean. |
| [CI]: | ...isn't no evidence behind. |
| COOK: | Clean. If, if it is evi–we was all in the room. What evidence could it be, my nigger? |
| [CI]: | I don't know. |
| COOK: | Nothin'! They already said from the gate, he ain't had no stroke. They had to come back...oh, and found, the only way they found he was ah...sh...ah...ah... |
| [CI]: | Suffocated. |
| COOK: | Suffocated is do the autopsy. |
| [CI]: | Mmm hmm. |
| COOK: | So that mean everything on the, on, on, on the ah...evidence thing, the crime scene no good. You see what I'm sayin'? |
| [CI]: | No prints on him, nothin'...(voices overlap). |
| COOK: | Nothin'. Nothin'. They can't do none of that, homie. Ain't no prints, ain't no none of that dog. |

Aplt's App. vol. I, at 52–56, 61–62, 65–66; vol. II, at 267–271, 276–77, 280–81.

Based on the recording of the conversation and the testimony of a prison official who surreptitiously observed the encounter, the district court characterized the foregoing communication between Cook and CI as "amiable:"

9

The conversation occurred at a normal to low volume and in the tone of two people who were familiar with each other and who were friends. While the two individuals were standing at a distance apart when the conversation began, they eventually moved close to each other and even leaned on a partition and sat as they spoke. There was no hesitancy in their words indicating any caution in speaking or any fear of the other person. The two smiled at various times during the conversation.

Aplt's App. vol. I, at 117.

The Government moved the district court for a pre-trial order admitting Cook's "jailhouse confession" into evidence at Defendant Smalls' trial. The Government asserted Cook's out-of-court statement was nontestimonial hearsay offered to prove the truth of the matter asserted but admissible under Fed. R. Evid. 804(b)(3) as a statement against Cook's penal interest. The district court assumed Cook's statement was nontestimonial and, as such, the question of its admissibility against Defendant Smalls lay outside the Sixth Amendment's "'core concerns.'"[6] Aplt's App. vol. I, at 88 (quoting Crawford v. Washington, 541 U.S. 36, 51 (2004)). Nonetheless, the district court analyzed the admissibility of Cook's statement under the framework of the Supreme Court's Confrontation Clause jurisprudence as set forth in Ohio v. Roberts, 448 U.S. 56 (1980). The district court focused its analysis, consistent with Roberts, on the question whether Cook's statement fit "within a firmly rooted hearsay exception" or otherwise showed "particularized guarantees

---

[6] The Sixth Amendment's Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.

10

of trustworthiness." Roberts, 448 U.S. at 66. The district court relied extensively on the Supreme Court's plurality opinion in Lilly v. Virginia, 527 U.S. 116 (1999) (plurality), which, in turn, relied on the Roberts' framework to "make explicit . . . that accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence." Lilly, 527 U.S. at 134. Lilly "'was premised on the basic understanding that when one person accuses another of a crime under circumstances in which the declarant stands to gain by inculpating another, the accusation is presumptively suspect and [absent "particularized guarantees of trustworthiness"] must be subjected to the scrutiny of cross-examination.'" Id. at 132 (quoting Lee v. Illinois, 476 U.S. 530, 541 (1986)).[7] Based on the foregoing, the district court held Cook's statement inculpating both himself and Defendant Smalls fell outside a firmly rooted exception to the hearsay rule. According to the district court, the context in which Cook made his statement confirmed that it was untrustworthy and unreliable:

> [T]he context of Mr. Cook's statement renders it inadmissible under Federal Rule of Evidence 804(b)(3). Mr. Cook was an accomplice who was interrogated by an agent of the government while in custody,

---

[7] In Lilly, as in Lee, the statement at issue was that of an accomplice made during a custodial interrogation. "In Lee, the Supreme Court held that the custodial statement of a nontestifying accomplice is presumptively unreliable and therefore inadmissible, but that the state can rebut this presumption by demonstrating 'particularized guarantees of trustworthiness.'" Earnest v. Dorsey, 87 F.3d 1123, 1127 (10th Cir. 1996) (citing Lee 476 U.S. at 543).

11

rendering his statement presumptively unreliable. Moreover, Mr. Cook attempted at various points in his statement to exculpate himself, to downplay the death as not intentional, and to shift much of the blame for the death of Mr. Gantz to his co-defendants. Thus, any portion of Mr. Cook's recorded out-of-court statement that inculpates Mr. Smalls is clearly inadmissible hearsay.

Aplt's App. vol. I, at 92-93.

## II.

We review the district court's ultimate decision that the entirety of Cook's out-of-court statement was inadmissible as against Defendant Smalls only for an abuse of discretion. We "will not disturb an evidentiary ruling absent a distinct showing that it was based on a clearly erroneous finding of fact, or an erroneous conclusion of law or manifests a clear error in judgment." United States v. Contreras, 536 F.3d 1167, 1170 (10th Cir. 2008) (quotations omitted). "A district court by definition abuses its discretion when it makes an error of law." Koon v. United States, 518 U.S. 81, 100 (1996). As we shall see, because the district court proceeded under an outdated and erroneous view of the law, its findings and conclusions as to the statement's unreliability, clouded by an improper characterization of the nature of Cook's statement, are beside the point. In short, the district court's analysis of the Government's pre-trial motion failed to conform to the standard of admissibility for nontestimonial hearsay set by Fed. R. Evid. 804(b)(3)–whether Cook's "statement was *sufficiently* against the declarant's penal interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be

12

true'" – and manifested a clear error of judgment.  Williamson, 512 U.S. at 603–04.

A.

Pointedly, Roberts was no longer good law when the district court made its decision in this case, rendering Lilly a dead letter and eviscerating not only the presumption of unreliability, but the entire foundation upon which the district court's order rested.  Roberts said:

> [W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable.  Even then, his statement is admissible only if it bears adequate "indicia of reliability."  Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.  In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

Roberts, 448 U.S. at 66.

Our narrative of Roberts' demise begins with Crawford, which criticized the Roberts standard as both under and overinclusive.[8]  The standard was underinclusive or too narrow because it failed to exclude the admission of all *ex parte* testimonial statements, and thus "failed to protect against paradigmatic confrontation violations."  Crawford, 541 U.S. at 60.  The standard was overinclusive or too broad because it required "close constitutional scrutiny" of nontestimonial hearsay "far removed from the core concerns of the Clause."  Id.  Crawford resolved the problem of

---

[8]  Crawford addressed the admissibility of a wife's statement, made during a police interrogation, that her husband, the defendant, had not stabbed the victim in self-defense.  At trial, the wife invoked the marital privilege and refused to testify.  Crawford, 541 U.S. at 38–40.

13

underinclusiveness by holding the Confrontation Clause constituted an absolute bar to the admissibility of a testimonial hearsay statement where the declarant was unavailable to testify at trial and the defendant had no prior opportunity to cross-examine the declarant.  Id. at 59.  For the time being, however, the Court declined to "definitively resolve" the problem of overinclusiveness, namely the issue of whether the Confrontation Clause left the admissibility of nontestimonial statements solely to the law of hearsay.  Id. at 61.

Two terms later, the Court in Davis v. Washington, 547 U.S. 813 (2006), squarely confronted the issue of whether the Confrontation Clause had any application to nontestimonial hearsay statements, or, in other words, whether any portion of Roberts remained good law.[9]  In Davis, the Court placed the question of the admissibility of nontestimonial hearsay statements entirely outside the confines of the Confrontation Clause and rendered Roberts academic:

> The answer to the . . . question was suggested in Crawford, even if not explicitly held:
>
>> "The text of the Confrontation Clause reflects this focus [on testimonial hearsay].  It applies to 'witnesses' against the accused – in other words, those who 'bear testimony.' 1 N. Webster, An American Dictionary of the English Language (1828).  'Testimony,' in turn, is typically 'a

---

[9] In Davis, the Court addressed the character of two statements.  The first involved a statement made to a 911 operator during the course of a domestic emergency.  The second involved a statement made in response to police questioning at the secured scene of a domestic disturbance.  Neither declarant was available as a witness at trial.  Davis, 547 U.S. at 817–21.

> solemn declaration or affirmation made for the purpose of
> establishing or proving some fact.' Ibid. An accuser who
> makes a formal statement to government officers bears
> testimony in a sense that a person who makes a casual
> remark to an acquaintance does not." 541 U.S., at 51.

> A limitation so clearly reflected in the text of the constitutional
> provision must fairly be said to mark out not merely its "core," but its
> perimeter.

Davis, 547 U.S. at 823–24.

Regrettably, we have been slow to come into compliance with the Court's controlling precedent. In United States v. Ramirez, 479 F.3d 1229 (10th Cir. 2007), a decision subsequent to both Crawford and Davis, we erroneously concluded, with nary a cite to the latter case, that district courts still should analyze the admissibility of nontestimonial hearsay statements under the pre-Crawford rubric of Roberts. Ramirez, 479 F.3d at 1247; cf. United States v. Nash, 482 F.3d 1209, 1217–20 (10th Cir. 2007) (holding the admission of out-of-court hearsay statements violated the Confrontation Clause without first addressing whether those statements constituted testimonial or nontestimonial hearsay); contra United States v. Williams, 506 F.3d 151, 157 (2d Cir. 2007) (recognizing that after Davis, "the Confrontation Clause does not bar . . . nontestimonial statements, whatever their guarantees of trustworthiness"). Yet just sixteen days prior to our opinion in Ramirez, the Supreme Court in Whorton v. Bockting, 549 U.S. 406 (2007) again explained:

> Roberts had held that the Confrontation Clause permitted the admission
> of a hearsay statement made by a declarant who was unavailable to
> testify if the statement bore sufficient indicia of reliability, either

15

because the statement fell within a firmly rooted hearsay exception or because there were "particularized guarantees of trustworthiness" relating to the statement in question. 448 U.S., at 66.

\* \* \*

Crawford . . . overruled Roberts and held that "[*t*]*estimonial* statements of witnesses absent from trial" are admissible "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine [the witness]." 541 U.S., at 59.

Bockting, 549 U.S. at 412–13 (emphasis added). Bockting reiterated that Crawford overruled Roberts because the latter's test for the admissibility of hearsay was both too narrow and too broad. "[T]he Roberts test was too 'malleable' in permitting the admission of *ex parte* testimonial statements." Id. at 414. More importantly for our purpose, "Roberts potentially excluded too much testimony because it imposed Confrontation Clause restrictions on nontestimonial hearsay not governed by that Clause." Id. at 413–14. In the end, the Court made clear that Crawford overruled Roberts in its entirety:

> With respect to testimonial out-of-court statements, Crawford is more restrictive than was Roberts, and this may improve the accuracy of factfinding in some criminal cases. . . . But whatever improvement in reliability Crawford produced in this respect must be considered together with Crawford's elimination of Confrontation Clause protection against the admission of unreliable out-of-court nontestimonial statements. *Under* Roberts, *an out-of-court nontestimonial statement not subject to prior cross-examination could not be admitted without a judicial determination regarding reliability. Under* Crawford, *on the other hand, the Confrontation Clause has no application to such statements and therefore permits their admission even if they lack indicia of reliability*.

Id. at 419–20 (emphasis added).

16

Needless to say, the Roberts standard, as applied to both testimonial *and* nontestimonial hearsay statements, plainly had been overruled when the district court issued its 2009 order relying on that standard to deny the admissibility of the entirety of Cook's statement in this case. Indeed, a panel of this Court so recognized in Garrison v. Ortiz, 2008 WL 4636723, at **2 (10th Cir. 2008) (unpublished), when it rejected as "not good law" Ramirez's holding that district courts should approach the admissibility of nontestimonial hearsay statements under the Roberts standard, and stated "*it is clear that the trustworthiness test established in Roberts has been overruled.*" (emphasis added). Accord United States v. Johnson, 581 F.3d 320, 325 (6th Cir. 2009), petition for cert. filed, No. 09-8948 (Feb. 2, 2010) (recognizing that Davis held the Confrontation Clause has no bearing on nontestimonial hearsay statements and Roberts no longer applies to such statements); see also United States v. Jordan, 509 F.3d 191, 201 n.5 (4th Cir. 2007) (recognizing that the Roberts standard once used to determine the admissibility of nontestimonial hearsay statements did not survive Crawford); United States v. Larson, 495 F.3d 1094, 1099 n.4 (9th Cir. 2007) (en banc) (same); but see United States v. Pursley, 577 F.3d 1204, 1223 (10th Cir. 2009) (referring to Crawford and Davis in passing as "partial[ly] overruling" Roberts); see generally 5 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 8.130, at 173 (3d ed. 2007) ("Roberts appears to be a dead letter after the Court's decisions in Crawford and more recently in Davis and Bockting.").

17

B.

As the district court recognized, if Cook's statement were testimonial this would be an easy case. Because Cook presumably will invoke his Fifth Amendment right to remain silent at Defendant Smalls' trial and be unavailable to testify, and because Defendant Smalls has had no prior opportunity to cross-examine Cook about the latter's hearsay statement, the Confrontation Clause would bar its admissibility: "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution prescribes: confrontation." Crawford, 541 U.S. at 68–69. Unfortunately for Defendant Smalls, the current state of the law as applied to the present facts dictates what the district court assumed, *i.e.*, that Cook's statement is nontestimonial.[10]

Once again our narrative begins with Crawford, wherein the Court left "for another day any effort to spell out a comprehensive definition of 'testimonial.'" Id. at 68. The Court, however, recognized "testimony" as "typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Id. at 51 (quotations and brackets omitted). The Court distinguished the "formal statement to government officers," which is testimonial, from the "casual remark to an acquaintance," which is nontestimonial. Id. The Court acknowledged

---

[10] At oral argument, Small's counsel conceded the point: "I'm willing to go forward and accept that Judge Brack's memorandum is that it is nontestimonial. That's fine."

18

that "[w]hatever else the term [testimonial] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." Id. at 68.

Subsequently in Davis, the Court spoke to the nature of testimonial statements in the specific context of police interrogations. The Court again declined to attempt "to produce an exhaustive classification of all conceivable statements – or even all conceivable statements in response to police interrogation – as either testimonial or nontestimonial." Davis, 547 U.S. at 822. In holding that statements made to a 911 operator during the course of a domestic emergency were nontestimonial while similar statements made to police at the secured scene of a domestic disturbance were testimonial, the Court reasoned:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. [Statements] are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecutions.

Id. The Court acknowledged that "even when interrogation exists, it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate." Id. at 822–23 n.1. The Court added it did not intend to imply "that statements made in the absence of any interrogation are necessarily nontestimonial. The Framers were no more willing to

19

exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation." Id.; see United States v. Summers, 414 F.3d 1287, 1302–03 (10th Cir. 2005) (holding as testimonial a declarant's statement "How did you guys find us so fast?" made to arresting officers). Nonetheless, the Court recognized "that *formality is indeed essential to testimonial utterance*," but not a "high degree" of such: "It imports sufficient formality, in our view, that lies to [police] officers are criminal offenses." Davis, 547 U.S. at 830–31 n.5 (emphasis added).

In Summers, a decision post-Crawford but pre-Davis, we held "a statement is testimonial if a reasonable person *in the position of declarant* would objectively foresee that his statement might be used in the investigation or prosecution of a crime."[11] Summers, 414 F.3d at 1302 (emphasis added). Upon close inspection, Summers' definition of "testimonial" appears somewhat in tension with Davis'

---

[11] In United States v. Townley, 472 F.3d 1267, 1272 (10th Cir. 2007), we opined that Davis "lends credence to this court's interpretation of 'testimonial' posited in [Summers]." See also Pursley, 577 F.3d at 1223 ("We have interpreted Davis as validating our preexisting definition of 'testimonial evidence.'"). Summers' definition appears to arise out of a formulation tendered to the Court in Crawford by amici National Association of Criminal Defense Lawyers. According to that definition, testimonial statements are "'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statements would be available for use at a later trial.'" Crawford, 541 U.S. at 52. In Davis, the Court explained that "[o]ur opinion in Crawford set forth various formulations of the core class of testimonial statements, but found it unnecessary to endorse any of them." Davis, 547 U.S. at 822 (quotations, brackets, and citation omitted).

20

strictures, and perhaps overly broad for two reasons. First, Summers' definition does not require the district court to account for the "essential" element of formality which is necessary to render a statement testimonial. Davis, 547 U.S. at 830–31 n.5 (stating "formality is indeed essential to testimonial utterance"). Second, Summers' definition does not require the district court to consider a statement in terms of its "primary purpose." Id. at 822 (recognizing not every statement made in response to interrogation is testimonial). For example, a reasonable person providing information to a 911 operator in the course of an emergency may well foresee that her statement might be used in the investigation or prosecution of a crime, but that is not the primary purpose for which the declarant makes the statement: "A 911 call . . . and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to establish or prove some fact, but to describe current circumstances requiring police assistance." Id. at 827 (quotations and brackets omitted).

Synthesizing Crawford and Davis, we might today formulate a definition of a testimonial statement which reads: a formal declaration made by the declarant that, when objectively considered, indicates the primary purpose for which the declaration was made was that of establishing or proving some fact potentially relevant to a criminal prosecution. Or, to better conform to the current state of Tenth Circuit precedent, we might say: A formal statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that the primary purpose

21

of the statement was for use in the investigation or prosecution of a crime. See Summers, 414 F.3d at 1302. As we recognized in Summers, "'[t]he proper inquiry . . . is whether the declarant intends to bear testimony against the accused.'" Id. at 1302 n.9 (quoting United States v. Cromer, 389 F.3d 662, 675 (6th Cir. 2004)). And the standard by which a court measures the declarant's intent is an objective one. See Davis, 547 U.S. at 822; Summers, 414 F.3d at 1302.

Fortunately, we need not now resolve the apparent tension between Davis and Summers, or tender a definitive definition of "testimonial," because Cook's statement is nontestimonial regardless of which of the foregoing definitions we apply. In Davis, the Court expressed the view that "statements made unwittingly to a Government informant" or "statements from one prisoner to another" are "clearly nontestimonial." Davis, 547 U.S. at 825 (citing Bourjaily v. United States, 483 U.S. 171, 181–84 (1987) and Dutton v. Evans, 400 U.S. 74, 87–89 (1970) (plurality)).[12] Similarly, beginning with then Judge Sotomayor's opinion for the Second Circuit in United States v. Saget, 377 F.3d 223 (2d Cir. 2004), our sister circuits have relied on definitions of "testimonial" akin to that which we tendered in Summers to hold

_____

[12] In Bourjaily, a confidential informant clandestinely recorded a conversation with the declarant, in which the latter implicated the defendant in a drug deal. Bourjaily, 483 U.S. at 173–74. In Dutton, a prisoner, an alleged accomplice in a murder, stated to another prisoner that if not for the defendant, "we wouldn't be in this now." Dutton, 400 U.S. at 77. In both cases, the Court held that although the defendant had no opportunity to cross-examine the declarant, the admission of the declarant's out-of-court hearsay statement implicating the defendant did not violate the Confrontation Clause.

22

"a declarant's statements to a confidential informant, whose true status is unknown to the declarant, do not constitute testimony within the meaning of Crawford." Saget, 377 F.3d at 229 (Sotomayor, J.); accord Johnson, 581 F.3d at 325 (recognizing that a declarant's statement unwittingly made to a confidential informant wearing a wire is not testimonial); United States v. Watson, 525 F.3d 583, 589 (7th Cir. 2008) (same); United States v. Udeozor, 515 F.3d 260, 270 (4th Cir. 2008) (same); United States v. Underwood, 446 F.3d 1340, 1347 (11th Cir. 2006) (same); United States v. Hendricks, 395 F.3d 173, 182–84 (3d Cir. 2005) (same).

All this leaves no doubt as to the legal character of Cook's statement. Cook's recorded statement to CI, known to Cook only as a fellow inmate, is unquestionably nontestimonial. In its order denying the statement's admissibility *in toto*, the district court erroneously characterized the encounter between Cook and CI as a custodial interrogation spawning a purportedly unreliable statement: "Mr. Cook was an accomplice who was interrogated by an agent of the government while in custody, rendering his statement presumptively unreliable." Aplt's App. vol. I, at 93. In Illinois v. Perkins, 496 U.S. 292 (1990), the Supreme Court established, albeit in the context of an alleged Miranda violation, that a conversation between an incarcerated suspect and an undercover agent does not constitute a custodial interrogation. Perkins, 496 U.S. at 295–97. We cannot properly label Cook's encounter with CI as a custodial interrogation because "[t]he essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an

23

incarcerated person speaks freely to someone whom he believes to be a fellow inmate." Id. at 296; see Cook, __ F.3d at __, 2010 WL 1268529, at *5.

Nor may we properly label CI's "questioning" of Cook outside a custodial context as interrogation under any generally accepted definition or in any formal sense of that term. See Webster's Third New Int'l Dictionary of the English Language (1961) (defining "interrogate" as "to question typically with formality . . ."); Davis, 547 U.S. at 823 (observing that "[t]he inquiries of a police operator in the course of a 911 call are interrogation in one sense, but not in a sense that qualifies under any conceivable definition"). As we very recently explained in the companion case of Cook, __ F.3d at __, 2010 WL 1268529, at *7:

> Here, there is no question that Cook spoke freely with the cooperating informant, was not coerced, and the circumstances surrounding their conversation were nothing akin to police interrogation. In our view, such casual questioning by a fellow inmate does not equate to 'police interrogation,' even though the government coordinated the placement of the fellow inmate and encouraged him to question Cook.

But whether we properly may label CI's encounter with Cook as an interrogation in some remote sense is beside the point because Davis establishes that not every statement made in response to an interrogation is testimonial. Rather, only "in *some* instances" does interrogation "tend to generate testimonial responses." Davis, 547 U.S. at 822–23 n.1 (emphasis added).

We focus our attention not on the nature of CI's questions, but on the nature of Cook's responses, because as the Supreme Court teaches in Davis, "even when

24

interrogation exists, *it is in the final analysis the declarant's statements*, not the interrogator's questions, *that the Confrontation Clause requires us to evaluate*." Id. (emphasis added); cf. Udeozor, 515 F.3d at 270 (suggesting that "[t]he intent of the police officers or investigators is relevant to a determination of whether a statement is 'testimonial' [but] only if it is first the case that a person in the position of the declarant reasonably would have expected that his statements would be used prosecutorially"). To such end, we first observe that Cook's statement was not, even to the slightest degree, a formal declaration. Cook's statement thus lacks the formality "essential to testimonial utterance." Davis, 547 U.S. at 830–31 n.5. Moreover, Cook did not make his statement to CI for the "primary purpose" of establishing or proving facts relevant to a criminal prosecution. See id. at 822, 827. Obviously, Cook would not have shared what he did had he known the Government was recording his statement or that his cellmate was a CI. See Watson, 525 F.3d at 589; Udeozor, 515 F.3d at 269. Objectively viewed from Cook's standpoint, his statement was much more akin to casual remarks to an acquaintance than formal declarations to an official. See Crawford, 541 U.S. at 51. Cook in no sense intended to bear testimony against Defendant Smalls; Cook in no manner sought to establish facts for use in a criminal investigation or prosecution. See Summers, 414 F.3d at 1302 & n.9. Cook boasted of the *details* of a cold-blooded murder in response to "casual questioning" by a fellow inmate and apparent friend. Cook, __ F.3d at __, 2010 WL 1268529, at *7. Cook's statement is undoubtedly nontestimonial under any

25

legitimate view of the law.

## C.

Because "[o]nly [testimonial] statements . . . cause the declarant to be a 'witness' within the meaning of the Confrontation Clause," Davis, 547 U.S. at 821, and because Cook's statement is nontestimonial, Fed. R. Evid. 804(b)(3) determines its admissibility, subject, of course, to Rule 403's balancing test. See United States v. Arnold, 486 F.3d 177, 192–93 (6th Cir. 2007) (en banc) (explaining that the only question pertinent to the admissibility of a nontestimonial statement is whether it meets the requirements of the Federal Rules of Evidence). As we just explained, the Confrontation Clause simply does not apply to nontestimonial statements and thus "permits their admission even if they lack indicia of reliability." Bockting, 549 U.S. at 420. To be sure, Fed. R. Evid. 802 renders hearsay, defined in Rule 801 as an out-of-court statement "offered in evidence to prove the truth of the matter asserted," generally inadmissible precisely because it is considered unreliable. See Williamson, 512 U.S. at 598. The hearsay rule, however, has long been subject to exception. Because certain hearsay statements are less subject to legitimate claims of unreliability, the Federal Rules of Evidence provide for their admissibility. One exception to the hearsay rule is an out-of-court statement against the declarant's penal interest. Such a statement is "not excluded by the hearsay rule [even] if the declarant is unavailable as a witness." Fed. R. Evid. 804(b). Subsection (b)(3) defines a statement against penal interest as follows: "A statement which . . . at the

26

time of its making . . . so far tended to subject the declarant to . . . criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true."[13] Fed. R. Evid. 804(b)(3). "Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." Williamson, 512 U.S. at 599. In other words, "[t]he circumstantial guaranty of reliability for declarations against interest is the assumption that persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true." Fed. R. Evid. 804 advisory committee's notes.

Consistent with this "commonsense notion" and "circumstantial guaranty" of reliability, the Court in Williamson construed the meaning of "statement" within

_____

[13] According to the plain language of Rule 804(b)(3), only the admissibility of "[a] statement tending to expose the declarant to criminal liability *and* offered to exculpate the accused" requires the presence of "corroborating circumstances [that] clearly indicate the trustworthiness of the statement." Fed. R. Evid. 804(b)(3) (emphasis added); see Jordan, 509 F.3d at 202 n.6. Prior to the demise of Roberts, many of our sister circuits also held the same sort of "corroborating circumstances" were necessary under Rule 804(b)(3) to establish the reliability of a self-inculpatory statement. This is not surprising given that the "confusion arose during the period when [all] statements against penal interest were thought to implicate Confrontation Clause jurisprudence and therefore required 'particularized guarantees of trustworthiness,' or a showing that this hearsay exception was 'firmly rooted.'" United States v. Wexler, 522 F.3d 194, 202 (2d Cir. 2008) (citations omitted); see Idaho v. Wright, 497 U.S. 805, 822 (1990) ("To be admissible under the Confrontation Clause [as interpreted in Roberts], hearsay evidence used to convict a defendant [had to] possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial.").

27

Rule 804(b)(3) to "cover only those declarations or remarks within the confession that are individually self-inculpatory."[14] Williamson, 512 U.S. at 599. The Court rejected the view "that an entire narrative, including non-self-inculpatory parts (but excluding the clearly self-serving parts . . . ) may be admissible if it is in the aggregate self-inculpatory." Id. at 601. Rather, in the Court's opinion:

> [T]he most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory. The district court may not just assume for purposes of Rule 804(b)(3) that a statement is self-inculpatory because it is part of a fuller confession and this is especially true when the statement implicates someone else.

Id. at 600–01. The Court noted "[t]he fact that a statement is self-inculpatory does make it more reliable," but "the fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts." Id. at 600. In directing district courts to exclude self-exculpatory portions of otherwise self-inculpatory statements, the Court moreover explained: "Self-exculpatory statements are exactly the ones which people are most likely to make even when they are false; and mere proximity to other, self-inculpatory, statements does not increase the plausibility of the self-exculpatory statements." Id.

---

[14] At issue in Williamson was the admissibility of statements the declarant made after he had been arrested for cocaine trafficking. The statements, made during a custodial interrogation, indicated the cocaine belonged to Williamson. Williamson, 512 U.S. at 596–97.

The Court accurately observed that the "'*arrest* statements of a codefendant have traditionally been viewed with special suspicion. Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence.'" Id. at 601 (emphasis added) (quoting Lee, 476 U.S. at 541). But even at a time when Roberts had not yet been overruled and the law of hearsay and right to confrontation remained blurred, the Court stopped well short of endorsing the proposition that Rule 804(b)(3) renders an accomplice's statement implicating a defendant in a crime presumptively unreliable regardless of the circumstances. Importantly, the Court recognized "[t]here are many circumstances in which Rule 804(b)(3) does allow the admission of statements that inculpate a criminal defendant," *including* "the confessions of arrested accomplices . . . if they are *truly* self-inculpatory, rather than *merely* attempts to shift blame or curry favor."[15] Id. at

---

[15] The Court's position is consistent with the Rule Advisory Committee's view that "by no means" must "all statements implicating another person be excluded from the category of declarations against interest:"

> Whether a statement is in fact against interest must be determined from the circumstances of each case. Thus, a statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest. . . . On the other hand, the same words spoken under different circumstances, e.g., to an acquaintance, would have no difficulty in qualifying.

Fed. R. Evid. 804 advisory committee's notes.

29

603 (emphasis added). "[A] declarant's statement is not magically transformed from a statement against penal interest into one that is inadmissible merely because the declarant names another person or implicates a possible co-defendant." Id. at 606 (Scalia, J., concurring).

Perhaps the best (but not only) examples of "truly self-inculpatory" statements admissible against third persons arise in cases of conspiracy. The Court provided the following explanation, apropos to the present state of affairs:

> For instance, a declarant's squarely self-inculpatory confession – "yes, I killed X" – will likely be admissible under Rule 804(b)(3) against accomplices who are being tried under a co-conspirator liability theory. Likewise, by showing that the declarant knew something, a self-inculpatory statement can in some situations help the jury infer that his confederates knew it as well. And when seen with other evidence, an accomplice's self-inculpatory statement can inculpate the defendant directly.

Id. at 603 (citation omitted). The Court further commented that "[e]ven statements that are on their face neutral may actually be against the declarant's interest."[16] Id. "A statement obviously can be self-inculpatory (in the sense of having so much of a tendency to subject one to criminal liability that a reasonable person would not make it without believing it to be true) without consisting of the confession 'I

---

[16] An example of a facially neutral yet admissible statement against penal interest that the Court employed was "'Sam and I went to Joe's house.'" Williamson, 512 U.S. at 603. The Court explained that this statement, which clearly implicates third persons, "might be against the declarant's interest if a reasonable person in the declarant's shoes would realize that being linked to Joe and Sam would implicate the declarant in Joe and Sam's conspiracy." Id.

30

committed X element of crime Y.'" Id. at 606 (Scalia, J., concurring). By the same measure, "other statements that give the police significant details about the crime may also, depending on the situation, be against the declarant's interest." Id. at 603. The Court explained that "whether a statement is self-inculpatory . . . can only be determined by viewing it in context:" "The question under Rule 804(b)(3) is *always* whether the statement was *sufficiently* against the declarant's penal interest" as the Rule objectively defines that phrase. Id. (emphasis added). And that depends not only on the contextual wording of the statement itself but also on the circumstances under which it was made. See id. at 603-04; accord Udeozor, 515 F.3d at 267 ("Viewed in context, many statements, even those that do not amount to an admission of a crime or an element of a crime, constitute statements 'against penal interest' for purposes of Rule 804(b)(3).").

Justice Holmes cogently recognized nearly a century past that "no other statement is so much against interest as a confession of murder." Donnelly v. United States, 228 U.S. 243, 278 (1913) (Holmes, J., dissenting). This surely is as true today as it was in Justice Holmes' time, regardless of whether such statement is offered to implicate or exonerate the accused. See Scott v. Mullin, 303 F.3d 1222, 1231 n.5 (10th Cir. 2002). We may safely surmise that from time immemorial, only on the rarest occasion, if ever, has one of sound mind–even one of sound mind who is not particularly honest–falsely confessed a murder to an apparent acquaintance or friend. The question whether any parts of Cook's statement within his extended

31

conversation with CI are admissible into evidence at Defendant Smalls' trial as sufficiently against Cook's penal interest, notwithstanding the fact that such parts also implicate Defendant Smalls in a murder, admits of only one answer.

By this point, the reader is well familiar with the circumstances surrounding Cook's statement, and we need not restate them here to once again emphasize the point that Cook most certainly was not seeking to curry favor with authorities in recounting the specifics of Gantz's murder to CI or seeking to shift or spread blame to his alleged co-conspirators so as to engender more favorable treatment from authorities. See United States v. US Infrastructure, Inc., 576 F.3d 1195, 1209 (11th Cir. 2009) (recognizing that a co-conspirator's statement made to a confidant obviated "any concern that [the declarant] was attempting to curry favor with the government by shifting blame to another individual"). As the district court's findings regarding the nature of the encounter between Cook and CI suggest, Aplt's App. vol. I, at 117, Cook responded to CI's questions as though he believed the two were engaged in casual conversation–nothing more. From Cook's standpoint, this was indeed the case, and that makes all the difference, providing a "circumstantial guaranty" of reliability not found in statements, arrest, custodial or otherwise, knowingly made to law enforcement officials. Cook spoke freely and openly to CI, all the while unknowingly rendering nontestimonial evidence bearing upon all aspects of the murder–agreement, act, intent, motive, and coverup. As we recently observed in Cook, "the circumstances surrounding their conversation were nothing

32

akin to police interrogation." Cook, __ F.3d at __, 2010 WL 1268529, at *7. Cases, like those on which the district court relied, holding that statements implicating accomplices and made in the context of such interrogation are unreliable simply have no application here. In those cases, "[h]aving been caught for a criminal offense, the suspects were simply trying to shift the primary responsibility to others." United States v. Patayan Soriano, 361 F.3d 494, 506 (9th Cir. 2004) (citing Lilly, Lee, and Williamson).

Next we turn from the circumstances surrounding the making of Cook's statement to the statement itself. Rather than carefully analyzing Cook's statement in accordance with Rule 804(b)(3) and Williamson to separate Cook's admissible from his inadmissible remarks, the district court, without ever discussing any particular parts of his statement, simply concluded based on its aforesaid erroneous view of the law that "the context of Mr. Cook's statement renders it inadmissible under Federal Rule of Evidence 804(b)(3)." Aplt's App. vol. I, at 92–93. The district court, without explanation, simply opined that Cook "attempted at various points in his statement to exculpate himself, to downplay the death as not intentional, and to shift much of the blame for the death of Mr. Gantz to his co-defendants." Aplt's App. vol. I, at 93. The court's conclusion–in effect a decision that no part of Cook's statement was sufficiently against his penal interest such "that a reasonable person in declarant's position would not have made the statement unless believing it to be true"–cannot withstand careful scrutiny under even the most deferential

33

standard of review.[17]

Not surprisingly, our review of Cook's extended statement as previously set forth herein reveals some instances where Cook arguably seeks to exculpate himself, at least to the extent that his comments might serve to mitigate punishment. See supra at 5–9. For instance, while plainly confessing to the murder and describing precisely how it occurred, Cook stated that Melgar-Diaz was the "ring leader" (which in any event bears upon the crime of conspiracy). A breath later, he said "[r]eally, it wasn't even no plot, homie." Shortly thereafter, Cook suggested that he and his cohorts "was just playin' really" when they placed the bag over Gantz head and held him down. So that the reader may view Cook's comments in the proper context, we repeat the relevant sequence here:

| | |
|---|---|
| [CI]: | But you sure ain't nobody can't say nothin'? |
| COOK: | Naw! If they do, we all involved, homie. That's the good thing. It ain't like just one of us... |
| [CI]: | No, I'm sayin' what happened? |
| COOK: | We killed the mother fucker. |

---

[17] Because our careful review of Cook's statement, considered in its entirety, and the circumstances under which it was made, admits of only one conclusion, namely that portions of his statement were sufficiently against his penal interest and thus admissible under Rule 804(b)(3), we need not now decide whether a determination that a statement is or is not sufficiently against a declarant's penal interest presents a question of law reviewable de novo, a question of fact reviewable for clear error, or a mixed question reviewable for an abuse of discretion. See United States v. Westry, 524 F.3d 1198, 1215 (11th Cir. 2008) (stating that a determination of whether a statement is against a declarant's penal interest is "purely" a question of law, but that consideration of a statement's reliability based on the surrounding circumstances "requires a review of findings of fact and a review of the trial court's application of a legal standard to the facts").

34

| [CI]: | No, I'm sayin' well how did this whole shit just go down, my man? |
|---|---|
| COOK: | Oh, cause he was snitchin', homie. |
| [CI]: | Who was the ring leader? |
| COOK: | The Mexican dude. |
| [CI]: | So the Mexican dude...plotted everything. |
| COOK: | (UI [unintelligible], voices overlap) |
| [CI]: | Or was it even plotted? |
| COOK: | Really, it wasn't even no plot, homie. It's like this nigger snitched, naw. Everybody around him, you wussy, he was what, what, what...so you know how we'd planned... |
| [CI]: | Yeah. |
| COOK: | ...you know how me and you (UI ) pushin' (UI)...me and "D" talkin' about let's get this, let's get the bag on this nigger. |
| [CI]: | Yeah. |
| COOK: | So we had a bag...so we was like what ya'll wanna do? I'm all hell I, everybody like fuck, come on. We was just playin' really right...we was like one, two, three, go. Put it over his head homie and, and come out to be a...and then it come out to be a mother fuckin' murder, homie. |
| [CI]: | So ya'll put the bag over his head? |
| COOK: | (laughing) |
| [CI]: | Who put the bag over the head? |
| COOK: | The Mexican dude. |
| [CI]: | And what'd you do? |
| COOK: | Held his hands. |
| [CI]: | And what did the black dude do? |
| COOK: | He held his feet. |

Aplt's App. vol. I, at 52–54; vol. II, at 267–69.

Though initially indicating Melgar-Diaz was the "ring leader," the excerpt reveals Cook promptly backed off from that portrayal. Moreover, throughout the relevant portions of his statement, Cook rather than seeking to shift blame repeatedly opined that because all three men were involved in Gantz's murder, none of them could say anything. See Aplt's App. vol. I, at 52; vol. II, at 267 ("[W]e all involved,

35

homie. That's the good thing. It ain't like just one of us."); vol. I, at 55; vol. II, at 270 ("I could see if I was the only one, or he was the only one, but he, we all had something to do with it, so we all can't say nothin'."); vol. I, at 65; vol. II, at 280 (Can't nobody just get up there and say no, he did it."). Similarly, Cook spoke of "how we planned . . . [to] get the bag on this nigger" because "this nigger snitched," directly after he commented on the lack of a "plot." As for Cook's comment that the three men "was just playin' really," any suggestion that Gantz's murder was an accident, or as the district court said "not intentional," is a gross misreading of Cook's statement in context. The events as Cook reported them to CI belie any such notion. Cook repeatedly boasted that, due to the lack of available evidence, he was not concerned about a possible criminal prosecution. His remark "[b]ut what can they do? . . . They can't do nothin'. That was a clean one right there. That's what you call clean, homie. . . . Clean. If, if it is evi – we was all in the room. What evidence could it be, my nigger?", is hardly that of a man involved in an accidental death. Aplt's App. vol. I, at 66; vol. II, at 281. Rather, the remark illustrates Cook's defiant attitude as also illustrated by his comment: "If I was worried my nigger, they can bring that shit on, but they ain't gonna have nothin' . . . ." Aplt's App. vol. I, at 64; vol. II, at 279. Cook went so far as to suggest, if not outright acknowledge, that Gantz's death was the result of a crime: "[E]verything on the, on, on, on the, ah...evidence thing, the crime scene no good. You see what I'm sayin'? . . . Nothin'. Nothin'. They can't do none of that, homie. Ain't no prints, ain't no none

of that dog." Aplt's App. vol. I, at 66; vol. II, at 281.

Apart from these three arguably exculpatory, or perhaps non-self-inculpatory, comments, the preceding excerpt itself plainly speaks to a conspiracy to commit murder, an act of murder, and a motive for murder.[18] While Cook stated he did not personally hold the bag over Gantz's head or hold down Gantz's legs (those Cook said were the respective tasks of Melgar-Diaz and Defendant Smalls), Cook, as an alleged co-conspirator, was certainly legally responsible for those acts. See Watson, 525 F.3d at 587; Johnson, 509 F.3d at 202. "Blaming one's self *and* someone else does not necessarily reduce a statement's trustworthiness . . . ." Watson, 525 F.3d at 588; see also Earnest v. Dorsey, 87 F.3d 1123, 1134 (10th Cir.1996) (upholding the admission of an accomplice's statement implicating himself and two other men in a murder). These comments as to how precisely Gantz's murder occurred are undoubtedly against Cook's penal interest and, coupled with the circumstances of their making, trustworthy to the extent required by Rule 804(b)(3). And that makes them *sufficiently* against Cook's penal interest, rendering them admissible under Rule 804(b)(3).

---

[18] CI's questions and comments do not constitute hearsay within Fed. R. Evid. 801's definition because they are not offered to prove the truth of the matter asserted, but rather are offered to establish their effect on Cook and provide context for his statement. See Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1434 (10th Cir. 1993) (recognizing that statements offered for their effect on the listener are not hearsay). Thus, Fed. R. Evid. 802 does not bar their admission.

Of course, <u>Williamson</u> tells us that neither self-exculpatory nor non-self-inculpatory portions of a statement are admissible under Rule 804(b)(3) as against penal interest. Rather, Rule 804(b)(3) "cover[s] only those declarations or remarks within the confession that are individually self-inculpatory." <u>Williamson</u>, 512 U.S. at 599. Thus, Cook's remarks suggesting Meglar-Diaz was the "ring leader," "there wasn't even no plot," and "we was just playin' really" *may* need to be extracted from the self-inculpatory parts of the foregoing excerpt before those parts may be deemed admissible. <u>See Williamson</u>, 512 U.S. at 600–01 (explaining the "mere proximity" of self-exculpatory to self-inculpatory statements does not render the former more trustworthy). Nonetheless, we can reach but one conclusion in this case: Much of the foregoing excerpt is sufficiently against Cook's penal interest such that no reasonable person would say those things without believing them to be true. Under the circumstances presented, a reasonable person would not falsely admit to participating in Gantz's murder aware of the possibility, however slight, that such admission could subject him to criminal prosecution and punishment. <u>See United States v. Westry</u>, 524 F.3d 1198, 1215 (11th Cir. 2008).[19]

---

[19] We use the extended excerpt set forth in part II.C. only as an example. We do not intend to pass upon the question of whether other parts of Cook's statement, considered in context, may also be sufficiently against his penal interest and thus admissible under Rule 804(b)(3). Instead, we leave that question to the district court to decide in the first instance.

Neither do two of Cook's other arguably exculpatory comments render his statement inadmissible in its entirety. Immediately prior to describing in some detail how he sought to cover up the murder by flushing the bag down the toilet, Cook laughingly remarked "and to tell you the truth, I ain't did nothin' (laughs)." Aplt's App. vol. I, at 61; vol. II, at 276. That Cook would find his comment amusing is scarcely surprising given just moments before, Cook told CI that his "story" was that he played no part in Gantz's murder and knew nothing about it because he was asleep: "I don't know what happened. That's my story and I'm stickin' to it, all the way to the end, homie. I ain't even gonna make up no stories no more." Aplt's App. vol. I, at 56; vol. II, at 271. Finally, in response to CI's comment that "there's a tradeoff" because Cook only "helped holdin' on," Cook remarked: "Yeah. So I'm justa accessory anyway." Aplt's App. vol. I, at 65; vol. II, at 280. While Cook's remark is an inaccurate statement of the law because 18 U.S.C. § 2 has abolished the common law distinction between principals and accessories, his remark from a layman's perspective is unremarkable. It simply reinforces Cook's prior statement that Melgar-Diaz was the co-conspirator who held the bag over Gantz's head while Cook held his hands and Defendant Smalls held his feet. Cook's remark does absolutely nothing to negate or lessen his aforementioned role in the self-described murder.

On remand, the district court should proceed consistent with this opinion and first determine what parts of Cook's extended confession are sufficiently against

his penal interest and therefore admissible under Fed. R. Evid. 804(b)(3). The court should then subject those selected statements not only to Rules 401 and 402's relevancy requirements, but also to Rule 403's balancing test. See Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 387 (2008) ("[Q]uestions of relevance and prejudice are for the District Court to determine in the first instance."). In determining whether the danger of unfair prejudice *substantially* outweighs a relevant statement's probative value, the district court should remain mindful of our admonition in United States v. Tan, 254 F.3d 1204, 1211 (10th Cir. 2001):

> Unfair prejudice in the Rule 403 context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one. The district court has considerable discretion in performing the Rule 403 balancing test. However, exclusion of evidence under Rule 403 that is otherwise admissible under the other rules is an extraordinary remedy and should be used sparingly.

(quotations and citations omitted).

REVERSED and REMANDED.[20]

---

[20] The dissent's analysis of this case misstates the law and warrants little response. Suffice to say that as inferior federal court judges we are not at liberty to decide cases on the basis of what we think the law should be. Rather, we are bound to decide cases on the basis of what the law is. The dissent's suggestion that we "misinterpret[] the Confrontation Clause," and "enable[] the government to use lies and ruses to skirt the Constitution" and "evade the[] law[] through trickery and subterfuge" are cutting words to a court bound by a constitutional oath to uphold the law consistent with the plain dictates of Supreme Court precedent. The law has long condoned in numerous instances the use of "trickery and subterfuge" by confidential informants and undercover agents to obtain confessions and other evidence of crime. As our opinion well explains, where the admissibility of a *nontestimonial* statement under Fed. R. Evid. 804(b)(3) is at issue, the *only* question is the likely veracity of such statement "that a reasonable person *in the declarant's position* would not have made the statement unless believing it to be true." Fed. R. Evid. 804(b)(3) (emphasis added).

09-2126, United States v. Smalls

**KELLY**, Circuit Judge, dissenting.

An accused's right to confront and cross-examine the witnesses against him ought not be subverted by subterfuge and trickery. Mr. Cook's statement was set up by the government and designed to constitute testimony. A reasonable person, aware of the true situation, would know that.

I would thus hold that admitting a custodial confession that blames a co-defendant, where the co-defendant will be unable to confront the declarant, violates both the Confrontation Clause and the Federal Rules of Evidence's hearsay rule.

First, the Confrontation Clause forbids the use of this testimony. If Mr. Cook and Mr. Smalls were tried together, the Confrontation Clause would bar using the confession against Mr. Smalls. United States v. Bruton, 391 U.S. 123, 137 (1968) (cited with approval, Crawford v. Washington, 541 U.S. 36, 57 (2004)). To avoid such a violation, the district court severed their trials. The government claims that severance solved any Confrontation Clause problems. But this is absurd. Severance does not cure Mr. Smalls's inability to cross-examine Mr. Cook.

Testimony need not result from formal interrogation. Rather, confessions elicited by governmental agents are sufficiently formal "when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Davis v. Washington, 547 U.S. 813, 822 (2006).

Here, the government surreptitiously induced Mr. Cook to testify against himself and others so that the government may prosecute them for a past murder. Any declarant with full knowledge of the facts would reasonably assume the government could and would use his words in investigation and prosecution.

The Founders enacted the Confrontation Clause to address exactly this situation. Crawford, 541 U.S. at 53 & n.4. They despised the civil law practice in which the government elicits ex parte confessions from incarcerated accomplices, uses them in court against an accused, and does not allow the accused to confront the declarants in court. Crawford, 541 U.S. at 43, 49-50. "Involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse — a fact born out time and again through history with which the Framers were keenly familiar." Crawford, 541 U.S. at 56 n.7. These constitutional concerns are present whether or not the declarant knows that the government is tricking him into admitting his involvement and at the same time manufacturing "testimony" against another. To accurately and objectively judge this situation, therefore, a court must consider all the circumstances — including that the government tricked the declarant and tampered with his reasonable expectations.

The court today, however, misinterprets the Confrontation Clause and renders it blind to such tactics. By limiting the objective inquiry solely to information known to the declarant when he spoke, the court enables the government to use lies and ruses to skirt the Constitution. To the extent other circuits agree with today's

holding — that government agents may obtain testimonial evidence by tricking a declarant, and then introduce it against an accused without allowing the accused to cross-examine the declarant — they reason wrongly and violate the rights of the accused. Cf. Davis, 547 U.S. at 826 (disapproving of police evasions of the Confrontation Clause).

The majority also likens this case to precedents concerning entirely different situations. Bourjaily v. United States, a conspiracy case pre-dating Crawford, concerned the admission of a statement unwittingly made to an informant during and in furtherance of a conspiracy. 483 U.S. 171 (1987); see Fed. R. Evid. 801(d)(2)(E). Admitting that statement "did not violate the Confrontation Clause for the . . . reason that it was not (as an incriminating statement in furtherance of the conspiracy would probably never be) testimonial." Giles v. California, 128 S.Ct. 2678, 2691 n.6 (2008); see also United States v. Saget, 377 F.3d 223, 229 (2d Cir. 2004) (admitting a co-conspirator's non-custodial statement that agents had elicited). Likewise, in Dutton v. Evans, remarks heard by a passive cellmate, who was not a government agent and who did not elicit any information, were not testimony. 400 U.S. 74, 87-89 (1970).

Radically different and much more serious, in this case (1) Mr. Cook's listener was an authorized informant; (2) no court has found by a preponderance of the evidence that Mr. Cook made the statement during or in furtherance of a conspiracy; (3) the interrogation took place in jail, after the commission of the crime; (4) the

-3-

informant actively solicited detailed information for use in investigation and prosecution; and (5) this was not an offhand remark nor a friendly chat.

Second, the district court correctly held that the Federal Rules of Evidence exclude this confession as hearsay. Fed R. Evid. 802. The court disagrees, holding that the "statement against interest" exception applies. Fed R. Evid. 804(b)(3). Under this exception, the hearsay rule does not exclude *purely self-inculpatory statements.* Williamson v. United States, 512 U.S. 594, 599-600, 603 (1994). Self-exculpatory statements do not fall under this exception. See Ct. Op. at 28. They are too unreliable to be admitted, even if mixed with elements of self-inculpation, because "[o]ne of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature." Id. at 599-600. "This is especially true when the statement implicates someone else." Id. at 601.

Mr. Cook's confession, while inculpating himself in some ways, was not purely inculpatory. He did not take full and sole responsibility for the crime. Rather, he minimized his participation. He equivocated and gave excuses for himself like, "We was just playin'." Mr. Cook cast primary responsibility on Mr. Melgar-Diaz and Mr. Smalls, and claimed that he himself was "justa accessory." Statements shifting blame to others are not truly self-inculpatory. Id. at 603. Mr. Cook's confession does not fall under the "against interest" exception, in no small part because a "reasonable person in [his] position might even think that implicating

-4-

someone else would decrease his practical exposure to criminal liability." Id. at 604.

Supreme Court cases surviving Crawford buttress this conclusion. No hearsay exception firmly roots accomplice confessions inculpating another. Lilly v. Virginia, 527 U.S. 116, 134 (1999) (plurality opinion) (cited with approval, Crawford, 541 U.S. at 56, 58); Lee v. Illinois, 476 U.S. 530, 545 (1986) (cited with approval, Crawford, 541 U.S. at 58-59). Courts exclude accomplices' blame-spreading confessions because they are inherently untrustworthy. Lilly, 527 U.S. at 133-34, 137-38. What would give such confessions reliability — that they were so far against one's penal interest that no reasonable person would make them — is not present when a declarant furthers, or at least thinks he is furthering, his own interests by minimizing his participation and spreading guilt. Id. at 131-32.

Mr. Smalls has the right to confront Mr. Cook if the government uses Mr. Cook's confession against him. The Confrontation Clause and the Federal Rules of Evidence's ban on hearsay evidence exist to prevent convictions based upon untrustworthy and unchallengeable evidence. The court today allows the government to evade these laws through trickery and subterfuge. In so doing, this court enables the government to convict Mr. Smalls on an unconstitutional basis.

I thus would exclude Mr. Cook's statements and affirm the district court.