FILED
United States Court of Appeals
Tenth Circuit

September 21, 2018

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

v.

RAYMOND MOYA,

    Defendant - Appellee.

No. 17-2043
(D.C. No. 1:15-CR-01889-JCH-1)
(D.N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **TYMKOVICH**, Chief Judge, **MORITZ** and **EID**, Circuit Judges.
_____

In this interlocutory appeal, the government challenges the district court's pretrial orders excluding testimony from two expert witnesses.[1] We conclude that the district court didn't abuse its discretion in excluding some of that testimony as a sanction for the government's failure to provide proper notice of its intent to present that testimony at trial. But we agree with the government that the district court erred in ruling that admitting the remaining testimony would violate the Confrontation Clause. Accordingly, we affirm in part and reverse in part.

_____

[*] This order and judgment isn't binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. But it may be cited for its persuasive value. *See* Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

[1] We have jurisdiction over the appeal under 18 U.S.C. § 3731. *See* § 3731 (providing such jurisdiction "if the United States attorney certifies to the district court that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding").

## Background

Dawn Sherwood is a certifying scientist with National Medical Services (NMS), a "full-service laboratory" that provides "forensic toxicological analysis of body fluids and tissues for drugs and intoxicants." App. vol. 1, 282. In 2011, the New Mexico Office of the Medical Investigator (OMI) collected blood and urine samples from a deceased individual (C.W.) and submitted those samples to NMS for testing. Based on the results of these tests, Sherwood signed a toxicology report in which she indicated that C.W.'s blood and urine tested positive for various illegal substances, including heroin.

Just over three years later, the government requested additional information from NMS about the cause of C.W.'s death. In response, forensic toxicologist Laura Labay reviewed Sherwood's toxicology report, several law-enforcement investigation reports, and some grand-jury testimony. Based on this review, Labay concluded that C.W. died of a heroin overdose.

Relying in part on that conclusion, the government charged Raymond Moya with distributing the heroin that caused C.W.'s death. *See* 21 U.S.C. § 841(b)(1)(C) (mandating longer sentence for distributing controlled substance "if death . . . results from the use of such substance"). To prove this charge, the government planned to introduce expert testimony about the cause of C.W.'s death.

Under Federal Rule of Criminal Procedure 16, the government was required to provide Moya with notice and a summary of its expert testimony by the district court's discovery deadline. And although it provided such notice for Labay, it failed

to do so for Sherwood.[2] Instead, two weeks before the scheduled trial date, the government sought to have Sherwood testify by video. In response, Moya moved to exclude Sherwood's testimony because the government failed to timely disclose that Sherwood would be one of its experts. *See* Fed. R. Crim. P. 16(d)(2)(C) (giving district court discretion to exclude evidence if government fails to comply with Rule 16).

The district court granted Moya's motion to exclude. In doing so, it found that (1) the government didn't provide any legitimate reason for its failure to timely disclose Sherwood's expert testimony; (2) Moya would be prejudiced by having to cross-examine a new expert witness on such short notice; and (3) a continuance wasn't feasible to cure this prejudice because of the parties' and the court's scheduling concerns.

Recognizing that the exclusion of Sherwood's testimony and report could impact the admissibility of some of Labay's testimony, the government then filed a motion in limine seeking to present that testimony. In its motion, the government represented that Labay would testify, based in part on Sherwood's report, that heroin caused C.W.'s death. But Moya moved to exclude Labay's testimony as well, arguing that its admission would violate his rights under the Confrontation Clause. The district court agreed. It concluded that in the absence of Sherwood's testimony and

---

[2] The government initially suggested that it complied with Rule 16 and provided Moya with timely notice of its intent to present Sherwood's testimony. But on appeal, the government "does not challenge" the district court's finding that it failed to comply with Rule 16's notice requirement. Aplt. Br. 18.

report, Labay's testimony would inappropriately parrot Sherwood's excluded testimony. Thus, the district court also excluded Labay's testimony.

The government appeals both of the district court's orders.

## Analysis

**I.      Sherwood's Testimony and Rule 16**

The government first argues that the district court erred by excluding Sherwood's testimony as a sanction for the government's failure to comply with Rule 16(a)(1)(G). We review the district court's decision to exclude this evidence for an abuse of discretion. *United States v. Banks*, 761 F.3d 1163, 1196 (10th Cir. 2014). Under this deferential standard of review, "we will not disturb the ruling unless it is arbitrary, capricious, whimsical[,] or manifestly unreasonable, or we are convinced that the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Id.* at 1197 (quoting *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc)).

Rule 16 requires the government to disclose certain information to the defendant, including, among other things, "a written summary of any [expert] testimony that the government intends to use." Fed. R. Crim. P. 16(a)(1)(G). When a party fails to comply with this requirement, the court can impose any appropriate sanction, including granting a continuance or excluding the undisclosed evidence. Fed. R. Crim. P. 16(d)(2).

In determining the appropriate sanction, a district court begins—as the district court did here—by considering the three *Wicker* factors: "(1) the reason for the delay,

4

including whether the non-compliant party acted in bad faith; (2) the extent of prejudice to the party that sought the disclosure; and (3) 'the feasibility of curing the prejudice with a continuance.'" *Banks*, 761 F.3d at 1198–99 (quoting *United States v. Wicker*, 848 F.2d 1059, 1061 (10th Cir. 1988)). But these three factors aren't necessarily dispositive; although they should "guide the district court in its consideration of sanctions," they don't "dictate the bounds of the court's discretion." *Id.* at 1199 (quoting *Wicker*, 848 F.2d at 1061).

### A.     Reason for Delay

In evaluating the government's reasons for its delayed disclosure, the district court first concluded that there was "no evidence of bad faith on the part of the [g]overnment." App. vol. 2, 311. Indeed, Moya conceded as much, telling the district court, "I know that there is not bad faith here." App. vol. 3, 402. No one disputes that finding on appeal, and we've found nothing in the record to contradict it.

But the district court also concluded that the government didn't provide a sufficient reason for its delayed disclosure. On appeal, the government challenges that conclusion by insisting the district court never "suggest[ed] that the government lacked a legitimate reason for the delay." Aplt. Br. 19.

We disagree. The only potential explanation the government offered below for its failure to provide Moya with timely notice of Sherwood's testimony was that "no party is perfect." App. vol. 3, 387. In response, the district court specifically stated that "it [was] not convinced that the [g]overnment's oversight [was] a sufficient reason to justify the lengthy delay." App. vol. 2, 312; *see also Banks*, 761 F.3d at

5

1199. Thus, by finding the government's only proffered reason insufficient, the district court indicated that the government didn't provide a legitimate reason for the delay. And we find no abuse of discretion in that conclusion. *See Wicker*, 848 F.2d at 1061 (holding that despite absence of bad faith, government's "neglect[]" of its disclosure duty justified district court's conclusion that this factor weighed in favor of defendant).

## B.      Prejudice

Next, the government argues that the district court erred in concluding "that requiring [Moya] to cross[-]examine a newly disclosed expert witness on such short notice would unfairly prejudice [him]." App. vol. 2, 312. The government insists Moya would not be prejudiced because he could not have been unduly surprised by its decision to call Sherwood as an expert witness. *See* Fed. R. Crim. P. 16 advisory committee's note to 1993 amendment (noting that purpose of requiring expert-testimony disclosure is "to minimize surprise that often results from unexpected expert testimony"); *United States v. Ivy*, 83 F.3d 1266, 1281 (10th Cir. 1996) (considering surprise as part of *Wicker*'s prejudice inquiry).[3] Specifically, the

---

[3] *Ivy* also notes that when a defendant doesn't ask for a continuance, "a court can often assume that counsel did not need more time to incorporate the information into the defense's game plan." 83 F.3d at 1281 (quoting *United States v. Sepulveda*, 15 F.3d 1161, 1178 (1st Cir. 1993)). Here, Moya didn't request a continuance. But the government doesn't ask us to take that fact into account in evaluating the second *Wicker* factor. Thus, we decline to do so. *See Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) (noting that arguments not made in opening brief are waived). And in any event, *Ivy* simply points out that a district court can make such an assumption; it doesn't indicate that a district court abuses its discretion if it chooses

government argues that Moya wasn't surprised because (1) he had Sherwood's report "well over a year before the scheduled trial date," Aplt. Br. 20, and (2) he listed Sherwood on the second of his three witness lists.

The government's factual assertions are accurate. But we disagree that those facts mean Moya wasn't surprised and thus wasn't prejudiced.

Merely having a copy of Sherwood's report wouldn't necessarily prompt defense counsel to prepare to cross-examine Sherwood as an expert. Likewise, that defense counsel once listed Sherwood as a potential defense witness would—at most—suggest that defense counsel might have been prepared to conduct a direct examination of Sherwood. But cross-examination and direct examination require distinct preparation. And preparing to cross-examine an *expert* witness is particularly tricky. *See Smith v. Ford Motor Co.*, 626 F.2d 784, 793 (10th Cir. 1980) (explaining that "even with the help of his [or her] own experts," an attorney "frequently cannot anticipate the particular approach [an] adversary's expert will take" (quoting Fed. R. Civ. P. 26 advisory committee's note to 1970 amendment)). Here, the government indisputably failed to include Sherwood in its earlier expert-witness disclosure or its earlier witness list. So the government's belated decision to call Sherwood as an expert witness likely surprised Moya. And that surprise operated to his detriment: before the government's late notice, Moya had no reason to plan or prepare to cross-

---

not to do so. *Cf. Banks*, 761 F.3d at 1199 (noting that *Wicker* factors don't "dictate the bounds of the court's discretion" (quoting *Wicker*, 848 F.2d at 1061)).

7

examine Sherwood. *See United States v. Golyansky*, 291 F.3d 1245, 1250 (10th Cir. 2002) (defining prejudice as impact on defendant's ability to prepare).

Citing *United States v. Charley*, 189 F.3d 1251 (10th Cir. 1999), the government disagrees. But *Charley* is distinguishable. True, we found no abuse of discretion in the district court's refusal to exclude expert testimony in that case. *Charley*, 189 F.3d at 1261. Yet unlike the government in this case, the government in *Charley* timely notified the defense that it would call certain witnesses. It merely failed to provide summaries of their planned testimony, as Rule 16 requires. *Id.* at 1257. Thus, the defendant in *Charley* knew that certain witnesses would testify on behalf of the government. But here, Moya had no notice at all that Sherwood would testify for the government: the government didn't notify Moya that it would call Sherwood as a witness until two weeks before trial, and the expert designation came less than one week before trial. Thus, the district court didn't abuse its discretion in finding that Moya would be prejudiced by having to prepare to cross-examine an expert witness on such short notice.

### C. Feasibility of a Continuance

In applying the third *Wicker* factor, a district court must consider whether a continuance is a feasible way to cure the prejudice. *See Banks*, 761 F.3d at 1199. Here, the district court concluded that a continuance wasn't feasible, in large part because of its own significant "docket and scheduling limitations." App. vol. 2, 312.

At the outset, the government asserts that Moya's opposition to a continuance makes the third *Wicker* factor "essentially irrelevant." Aplt. Br. 24 (quoting *Ivy*, 83

F.3d at 1281); *see also Ivy*, 83 F.3d at 1281 (characterizing "third *Wicker* factor" as essentially irrelevant" because defendant "made it clear she did not want a continuance"). But the government didn't make this argument below. In fact, it adopted precisely the opposite position: rather than characterizing this third factor as "irrelevant," Aplt. Br. 24, the government told the district court that—despite Moya's opposition to a continuance—the court nevertheless "need[ed] to consider" this factor and couldn't "skip over that step" in the *Wicker* analysis, App. vol. 3, 410–11. Thus, we could apply the invited-error doctrine and hold that the government waived this argument below. *Cf. United States v. LaHue*, 261 F.3d 993, 1013 (10th Cir. 2001) (noting that invited-error doctrine precludes review on appeal of argument when that argument is "directly contradictory" to appellant's position in district court). Moreover, even if the government merely forfeited this argument below, it doesn't argue for plain error on appeal. Accordingly, we could decline to consider its assertion that the third *Wicker* factor is irrelevant on that basis as well. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011) (noting that failure to argue for plain error on appeal "surely marks the end of the road" for argument not raised below).

In any event, we reject this argument on the merits. As an initial matter, the third *Wicker* factor simply requires the district court to consider the feasibility of a continuance that could cure the prejudice. *See Wicker*, 848 F.2d at 1061. *Wicker* says nothing about only considering the feasibility of a continuance if a party requests one. Moreover, even assuming that Moya's opposition to a continuance makes the

third *Wicker* factor "essentially irrelevant," that simply means the factor doesn't weigh in anyone's favor; it doesn't mean the factor weighs against Moya, as the government contends. *Ivy*, 83 F.3d at 1281. And the other two *Wicker* factors weigh in Moya's favor, leaving the balance tilted toward him. Additionally, Moya's opposition to a continuance isn't relevant to one of the district court's primary reasons for finding a continuance wasn't feasible: its own docket and scheduling limitations. In other words, even if Moya requested a continuance, it doesn't appear the district court would have found that option to be a feasible one. Thus, we reject the government's position that the third *Wicker* factor weighs against Moya because Moya was opposed to a continuance.

The government next argues that the district court's analysis of the third *Wicker* factor was insufficient. In particular, it complains that the district court didn't expressly consider the length of a continuance that might be necessary to cure the prejudice. But the only authority the government cites to support this argument is *United States v. Yepa*, 572 F. App'x 577, 586 (10th Cir. 2014) (unpublished) (noting that findings about necessary length of continuance should be part of analysis). And "[u]npublished decisions are not precedential." 10th Cir. R. 32.1(A). Moreover, *Wicker* doesn't require that the district court consider any particular facts related to the feasibility of a continuance; indeed, *Wicker* explicitly eschews such a proscriptive approach. *See* 848 F.2d at 1061 (noting that *Wicker* factors "are not intended to dictate the bounds of the court's discretion"). And in any event, we read the record as suggesting the district court believed a continuance of *any* length would be

10

problematic: it noted that multiple continuances had already occurred in this case and emphasized the difficulty of rescheduling the trial both because of the court's docket and because of the "challenge to reschedule all the defense witnesses." App. vol. 2, 312.

The district court appropriately contemplated such considerations in determining whether a continuance was feasible, even independent of the prejudice analysis. As the *Wicker* court itself noted, "the district court may need to suppress evidence that did not comply with discovery orders to maintain the integrity and schedule of the court even though the defendant may not be prejudiced." 848 F.2d at 1061. Here, the district court concluded that because of "the difficulties inherent in rescheduling the case" and "the [c]ourt's own docket and scheduling limitations," it wasn't "clear that a continuance would be a feasible way to cure the prejudice." App. vol. 2, 312. The government hasn't challenged that finding, and we find support for it in the record.[4] We thus hold the district court did not abuse its discretion in reaching that conclusion.

---

[4] Although the government never argues that the district court relied on an erroneous factual finding when evaluating this factor, the dissent nevertheless asserts that it did so. Specifically, the dissent contends that there's no record support for the district court's finding that the government "did not want a continuance." App. vol. 2, 312. We disagree. At the hearing, the government said, "[R]ight now we are not in a position to ask for a continuance because we are ready to go." App. vol. 3, 421–22. Then, the district court said, "Nobody wants a continuance, including me." *Id.* at 422. And the government replied, "Right. We would certainly do it if that gets us to the point where everybody gets what they want." *Id.* Thus, although the government ultimately acceded to a continuance in the unlikely event that such a continuance would mean "everybody g[ot] what they want[ed]," it also unequivocally indicated it didn't want one. *Id.* So even if the government had challenged this finding as clearly

11

## D. Balancing the *Wicker* Factors

Finally, even assuming the district court didn't abuse its discretion in evaluating the individual *Wicker* factors, the government argues that we should reverse because we have "held on numerous occasions that district courts abused their discretion in excluding evidence even where the justification for exclusion was considerably stronger than it was in this case." Aplt. Br. 25. But the cases the government cites don't support this assertion.

The government is correct that the facts in at least some of these cases are arguably more egregious than the facts present here. *See, e.g.*, *United States v. Gonzales*, 164 F.3d 1285, 1291 (10th Cir. 1999) ("[T]he government knowingly and intentionally violated discovery orders and misrepresented the witness' status and whereabouts to the court and defense counsel."). But the government overlooks our reasons for reversing in each of the cases it cites. It wasn't because we found the government's behavior insufficiently egregious, as the government seems to suggest. It was because the district courts' ultimate decisions to exclude evidence were based on intermediate findings that we determined were legally or factually flawed. *See Golyansky*, 291 F.3d at 1250 (reversing because district court legally erred when it relied on its finding that defendant would be prejudiced by "additional financial

erroneous, we would reject that challenge; this exchange supports the district court's finding that the government "did not want a continuance." App. vol. 2, 312; *see also United States v. Sanchez-Urias*, 887 F.3d 1069, 1071 (10th Cir. 2018) (explaining that "factual finding is clearly erroneous" only "if it lacks evidentiary support or if a review of the evidence leaves us with the definite and firm conviction that a mistake has been made" (quoting *United States v. Mirabal*, 876 F.3d 1029, 1032 (10th Cir. 2017), *cert. denied*, 138 S. Ct. 2008 (2018))).

burdens should the case be continued"; holding that "[t]he concept of prejudice does not encompass the expense of additional trial preparation"); *Gonzales*, 164 F.3d at 1292 (reversing because we found "no record support whatsoever" for district court's conclusion "that the prejudice to defendants" from government's misconduct "was irreparable"); *United States v. Ivory*, 131 F. App'x 628, 632 (10th Cir. 2005) (unpublished) (reversing because district court legally erred in relying on government's discovery misconduct in separate cases without providing government with advance notice of its intent to do so).

But the government fails to identify any similar legal or factual errors here. As discussed above, the district court found that the government didn't sufficiently justify its failure to provide notice of Sherwood's expert testimony, that the government's failure prejudiced Moya, and that a continuance wasn't feasible to cure that prejudice. And the government has failed to demonstrate that these findings were clearly erroneous or that the district court committed any legal error in taking these findings into account. Accordingly, the cases the government relies on are inapposite and do not require us to find an abuse of discretion here.

Next, the government points out that we have previously affirmed the exclusion of evidence when a party attempted to introduce it after trial had commenced. *See, e.g.*, *Banks*, 761 F.3d at 1199 (holding that district court didn't abuse its discretion in excluding certain testimony where defendant sought to "call expert witnesses on the ninth day of trial"); *United States v. Russell*, 109 F.3d 1503, 1510, 1512 (10th Cir. 1997) (holding that district court didn't abuse its discretion in

13

excluding testimony of substitute witnesses when defense counsel gave government notice of intent to call those witnesses on morning of fifth day of trial). But here, the government's late disclosure occurred before the trial was scheduled to begin, rather than mid-trial. So the government argues that the prejudice in this case is less severe than in *Banks* and *Russell*. But the fact that a district court *doesn't* abuse its discretion in excluding evidence that isn't disclosed until after trial has commenced doesn't necessarily mean that a district court *does* abuse its discretion in excluding evidence that is disclosed before that point. To hold otherwise would too narrowly circumscribe the "broad discretion" that district courts possess to "impos[e] sanctions on parties who violate discovery orders." *Gonzales*, 164 F.3d at 1291.

In a related argument, the government insists that a continuance is the typical remedy for a Rule 16 violation in the absence of bad faith or when trial isn't already in progress. *See Golyansky*, 291 F.3d at 1249 ("In the absence of a finding of bad faith, the court should impose the least severe sanction that will accomplish prompt and full compliance with the discovery order."); *Wicker*, 848 F.2d at 1062 ("A continuance may normally be the most desirable remedy . . . ."). But "the 'admonition that the trial court must impose the least severe sanction that will accomplish . . . prompt and full compliance with the court's discovery orders does not mean that a continuance is necessary just because it will cure the prejudice.'" *Banks*, 761 F.3d at 1199 (alteration in original) (quoting *Russell*, 109 F.3d at 1512). In fact, by indicating that a continuance "may *normally* be" the appropriate remedy,

*Wicker* necessarily recognizes that other remedies—such as exclusion—will be appropriate in some circumstances. *Wicker*, 848 F.2d at 1062 (emphasis added).[5]

Thus, for the reasons discussed above, we hold that the district court didn't abuse its discretion in excluding Sherwood's expert testimony. *See Banks*, 761 F.3d at 1197 (noting that an abuse of discretion occurs when a decision "is arbitrary, capricious, whimsical[,] or manifestly unreasonable," or when "the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances" (quoting *Nacchio*, 555 F.3d at 1241)). In reaching that conclusion, we emphasize that the question before us isn't whether exclusion is the sanction that we would have chosen. *See Gonzales*, 164 F.3d at 1294 (McKay, J., concurring in part and dissenting in part). The question is whether the district court abused its discretion when it decided that this was one of the "rare case[s]" in which exclusion was appropriate. *Golyansky*, 291 F.3d at 1249. We conclude that it did not.

## II.     Labay's Testimony and the Confrontation Clause

Next, the government argues that the district court erred when it found that allowing the government to present Labay's testimony—which would be based in

---

[5] Relying on language in *Golyansky*, the dissent similarly states that a district court is "oblige[d]" to impose "the least severe sanction that will accomplish prompt and full compliance with the discovery order." Dissent 6 (quoting *Golyansky*, 291 F.3d at 1249). But the dissent reads the language in *Golyansky* too broadly. Contrary to the dissent's position, *Golyansky* doesn't "limit[]" a district court's discretion when deciding on sanctions for Rule 16 violations. *Id.* Instead, *Golyansky* simply notes that a district court "*should* impose the least severe sanction" and that "[t]he *preferred* sanction is a continuance." 291 F.3d at 1249 (emphases added). Words like "should" and "preferred" connote recommendations—not requirements. *Id.* As such, we disagree with the dissent's assertion that the district court's "discretion [was] limited" or "cabined" by our caselaw. Dissent 1, 6.

15

part on Sherwood's toxicology report—would violate the Confrontation Clause. "We review de novo a district court's legal conclusions regarding the Confrontation Clause." *United States v. Garcia*, 793 F.3d 1194, 1211 (10th Cir. 2015).

"The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" *Crawford v. Washington*, 541 U.S. 36, 42 (2004) (alteration in original) (quoting U.S. Const. amend. VI). In practice, the Confrontation Clause prohibits the admission of testimonial hearsay at trial unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant. *See id.* at 53–54. The key word here is "testimonial": the Confrontation Clause only applies to *testimonial* hearsay. *See id.* at 68. As such, we begin with the government's argument that Sherwood's toxicology report isn't testimonial, and thus admitting Labay's testimony based on that report wouldn't violate the Confrontation Clause.

Generally speaking, a statement is testimonial if it's "made with the primary purpose of creating evidence for the prosecution." *United States v. Alcorta*, 853 F.3d 1123, 1137 (10th Cir. 2017); *see also Bullcoming v. New Mexico*, 564 U.S. 647, 659 n.6 (2011) (defining testimonial statement as one with "a 'primary purpose' of 'establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution'" (alterations in original) (quoting *Davis v. Washington*, 547 U.S. 813, 822 (2006))). Applying this primary-purpose test, *see Ohio v. Clark*, 135 S. Ct. 2173, 2179 (2015), we consider whether "a reasonable person in the position of the

16

declarant would objectively foresee that the primary purpose of the statement was for use in the investigation or prosecution of a crime." *United States v. Ibarra-Diaz*, 805 F.3d 908, 917 (10th Cir. 2015) (quoting *United States v. Smalls*, 605 F.3d 765, 778 (10th Cir. 2010)).

The government contends that Sherwood's toxicology report doesn't meet the primary-purpose test and thus isn't testimonial. Moya responds, although without any elaboration or explanation, that the report is testimonial. Courts applying the primary-purpose test to forensic reports tend to consider both (1) the general relationship between law enforcement and the agency that completed the testing as well as (2) the particular facts and circumstances of the case, such as the passage of time between the creation of the report and the criminal charges. *See, e.g.*, *United States v. James*, 712 F.3d 79, 97–99 (2d Cir. 2013); *United States v. Ignasiak*, 667 F.3d 1217, 1231–33 (11th Cir. 2012); *United States v. Moore*, 651 F.3d 30, 73 (D.C. Cir. 2011). For example, in *James*, the Second Circuit held that the declarant's primary purpose in preparing an autopsy report wasn't to "creat[e] a record for use at a later criminal trial" because (1) the New York City Office of the Chief Medical Examiner was an agency that was independent from law enforcement and (2) that office completed the autopsy report long before law enforcement began a criminal investigation into the victim's death. 712 F.3d at 97–99. Thus, the autopsy report wasn't testimonial. *Id.* at 99; *cf. Ignasiak*, 667 F.3d at 1231–32 (holding that an autopsy report was testimonial primarily because under statutory framework, Florida Medical Examiner's Office existed within Department of Law Enforcement).

17

Here, New Mexico requires medical examiners to conduct an autopsy if the medical examiner suspects the death was caused by a criminal act or if "the cause of death is obscure." N.M. Stat. Ann. § 24-11-7. Medical examiners must also report their findings directly to the district attorney in all cases they have investigated. *Id.* § 24-11-8. And, as Moya asserts in a letter of supplemental authority, this statutory framework could support the conclusion that some reports generated by medical examiners are testimonial. *See State v. Navarette*, 294 P.3d 435, 440–41 (N.M. 2013) (finding autopsy report testimonial based in part on statutory connection between OMI and law enforcement).

But in this case, we aren't concerned with an autopsy report generated by a medical examiner. Rather, as the government points out, this case involves a "toxicology report [that] was ordered not by law enforcement in connection with a prosecution, but by the OMI in connection with an investigation into the cause of a death." Aplt. Br. 38–39. Thus, the statutory relationship between law enforcement and OMI isn't the only factor relevant to our inquiry about whether the toxicology report created by NMS is testimonial. And when we focus on the other relevant factors, we conclude that the toxicology report in this case isn't testimonial. *See Clark*, 135 S. Ct. at 2182 (noting that "[c]ourts must evaluate challenged statements in context").

First, as the government points out, almost four years passed between August 2011, when C.W. died and Sherwood completed her report, and May 2015, when the government charged Moya. The record doesn't disclose exactly when, in this nearly-

18

four-year period, law enforcement either (1) began investigating C.W.'s death or (2) connected his death to Moya's alleged heroin distribution. What we do know is that Labay completed her first cause-of-death report in October 2014, over three years after Sherwood certified the toxicology report. In addition, Labay's report identifies the investigation reports that she relied on, most of which are from 2013 and the earliest of which appears to be dated September 2012. Thus, it appears that Sherwood certified her report at least one year before any criminal investigation into C.W.'s death began, if not longer. This time gap suggests that the toxicology report isn't testimonial. *See James*, 712 F.3d at 99 (finding autopsy report not testimonial in part because it was completed "substantially before any criminal investigation into [victim's] death had begun"); *id.* at 101 (finding toxicology report not testimonial in part because there was "no indication . . . that a criminal investigation was contemplated during the inquiry"); *cf. State v. Bass*, 132 A.3d 1207, 1225 (N.J. 2016) (finding autopsy report testimonial in part because autopsy took place during active homicide investigation).

Second, the government points out that law enforcement didn't request the toxicology report from NMS. Nor does it appear that law enforcement received a copy of it directly from NMS. Instead, OMI requested the toxicology testing, and it appears that Sherwood sent her report directly to OMI, not to law enforcement. And although it's not determinative, this further suggests that the toxicology report isn't testimonial. *See James*, 712 F.3d at 101 n.3 (noting that involvement of law enforcement in forensic investigation isn't determinative); *State v. Mattox*, 890

19

N.W.2d 256, 267 (Wis. 2017) ("The toxicology report at issue in [this] case was not prepared for or given to law enforcement, making it *much less likely* to be testimonial."); *cf. Clark*, 135 S. Ct. at 2181 (finding that statements made to someone other than law enforcement are more likely to be nontestimonial).

Third, the record doesn't disclose any other facts that would suggest to a reasonable person in Sherwood's position that the primary purpose of her report detailing the results of the blood and urine tests was for criminal investigation or prosecution. *See Ibarra-Diaz,* 805 F.3d at 917 (noting that test is whether reasonable person "would objectively foresee that the primary purpose of the statement was for use in the investigation or prosecution of a crime" (quoting *Smalls*, 605 F.3d at 778)). True, she worked for a forensic lab and therefore conducted testing that could theoretically be used in criminal investigation or prosecution. But as the government points out, OMI routinely conducts autopsies that don't ultimately lead to criminal investigations or prosecutions. *Cf. James*, 712 F.3d at 99 & n.10 (concluding, based on statistics, that "there is reason to believe that [no criminal investigation] is pursued in the case of most autopsies"). And nothing about the report Sherwood signed in this case suggested any criminal investigation or prosecution would be forthcoming. Her toxicology report is distinct, for example, from the testimonial autopsy report in *Bass*. There, the "autopsy was conducted in the presence of two law enforcement officers" and the autopsy report concluded that the manner of death was a gunshot wound to the back of the victim's torso—an obvious indication that the wound wasn't self-inflicted. *Bass*, 132 A.3d at 1225–26; *see also Moore*, 651 F.3d at

20

73 (finding autopsy reports testimonial when they concluded that manner of death was "homicide caused by gunshot wounds" and homicide detectives attended several autopsies and participated in creation of reports). Nor does the record disclose any other interaction between NMS and law enforcement in connection with the creation of the toxicology report. *See James*, 712 F.3d at 101 n.13 (finding involvement of law enforcement in transporting samples was routine and thus did "not indicate that a criminal investigation was contemplated"). These facts thus further suggest the nontestimonial status of this particular toxicology report.

Additionally, we agree with the government's assertion that Sherwood's toxicology report isn't like the testimonial affidavits in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), or the testimonial lab report in *Bullcoming*, 564 U.S. at 664–65. In *Melendez-Diaz*, the Court held that affidavits certifying a seized substance as cocaine were "functionally identical to live, in-court testimony." 557 U.S. at 310–11. But the toxicology report here differs from the affidavits in *Melendez-Diaz* in two important ways. First, the testing in *Melendez-Diaz* was conducted at law enforcement's request. *Id.* at 308. Here, as we've explained, law enforcement had no involvement with the creation of the toxicology report. Second, the affidavits in *Melendez-Diaz* stated their evidentiary purpose on their face. *Id.* at 311. But the toxicology report contains no similar statement, and it served no obvious evidentiary purpose at the time Sherwood signed it. In sum, the toxicology report is not the same as affidavits sworn for the "*sole purpose*" of providing "'prima facie

21

evidence of the composition, quality, and the net weight' of [an] analyzed substance." *Id.* (quoting Mass. Gen. Laws ch. 111, § 13 (repealed 2012)).

Nor is Sherwood's toxicology report similar to the "certificate of analyst" containing the results of a blood-alcohol test introduced without the testimony of the analyst in *Bullcoming*. 564 U.S. at 653 (quoting App. 62). Like in *Melendez-Diaz*, the blood alcohol testing in *Bullcoming* was administered after a law-enforcement officer provided seized evidence to a state laboratory following a DUI arrest, and the lab report itself included details about how it could be admitted as evidence in court. *Id.* at 665. Neither of those facts exists here. True, the *Bullcoming* court said that "[a]n analyst's certification prepared *in connection with a criminal investigation or prosecution*" is testimonial and can't be introduced at trial absent testimony from the certifying analyst. *Id.* at 658–59 (emphasis added). But here, as we've already outlined, Sherwood's certification wasn't "prepared in connection with a criminal investigation or prosecution." *Id.* at 658.

For comparison's sake, consider Labay's reports. She completed those reports at the request of law enforcement about six months before the government indicted Moya. She relied on investigative reports, the autopsy report, the toxicology report, and grand-jury testimony to conclude that C.W. died of a heroin overdose. And the facts surrounding the creation of these reports—the closeness in time and law enforcement's involvement—indicate that Labay completed them "in connection with a criminal investigation or prosecution." *Id.* Likewise, a reasonable forensic toxicologist, when completing such a report, would foresee that "the primary

22

purpose" was "the investigation or prosecution of a crime." *Ibarra-Diaz*, 805 F.3d at 917 (quoting *Smalls*, 605 F.3d at 778). On the other hand, there are no similar facts indicating that Sherwood completed her report to establish or prove "past events potentially relevant to later criminal prosecution." *Bullcoming*, 564 U.S. at 659 n.6 (quoting *Davis*, 547 U.S. at 822). Instead, we conclude that the primary purpose of Sherwood's report was "to determine the cause of C.W.'s death." Aplt. Br. 36; *see also Mattox*, 890 N.W.2d at 268 (finding toxicology report nontestimonial "because its primary purpose was to identify the concentration of the tested substances in biological samples sent by the medical examiner as a part of her autopsy to determine the cause of death").

As such, Sherwood's toxicology report is not testimonial.[6] And because the Confrontation Clause only applies to testimonial hearsay, *see Crawford*, 541 U.S. at 68, Labay's reliance on Sherwood's report doesn't implicate that constitutional provision.[7] We therefore reverse the district court's order excluding Labay's testimony.

---

[6] The government further argues that the Supreme Court's decision in *Williams v. Illinois*, 567 U.S. 50 (2012), supports this conclusion. And to the extent that *Williams* found a forensic test—in particular, a DNA report—to be nontestimonial, the result in that case corresponds to the result we reach here. *See Williams*, 567 U.S. at 57–58 (plurality opinion). But as some of our sibling circuits have concluded, *Williams* lacks a controlling rationale for that result. *United States v. Duron-Caldera*, 737 F.3d 988, 994 n.4 (5th Cir. 2013); *James*, 712 F.3d at 95. Thus, *Williams* offers little, if any, actual guidance here.

[7] Because we hold that Sherwood's report isn't testimonial under the primary-purpose test, we don't address the government's argument that the toxicology report isn't testimonial because it contains only data generated by machines. But we do note that this point is markedly similar to an argument that the Supreme Court rejected in

**Conclusion**

Because the district court didn't abuse its discretion when it examined and balanced the *Wicker* factors and sanctioned the government for violating Rule 16, we affirm the district court's order excluding Sherwood's testimony. But we also conclude that Sherwood's report isn't testimonial. As a result, Labay may testify based in part on that report without running afoul of the Confrontation Clause. So we reverse the district court's order excluding Labay's testimony and remand for further proceedings.

Entered for the Court

Nancy L. Moritz
Circuit Judge

---

*Bullcoming*. *See* 564 U.S. at 659–61 (rejecting New Mexico court's conclusion that analyst's report and certification merely transcribed results produced by machines; noting that report contained "more than a machine-generated number").

*United States v. Moya*, No. 17-2043
**EID**, J., dissenting.

Our precedent states that the exclusion of a witness to remedy a discovery

violation should be a "rare" occurrence absent bad faith. *United States v. Golyansky*, 291

F.3d 1245, 1249 (10th Cir. 2002). In *United States v. Gonzales*, for example, we

concluded that the district court "abused its discretion in imposing what was obviously

the most severe available sanction, i.e., complete suppression of the witness' statements

and trial testimony" because the sanction was "too severe" under the circumstances. 164

F.3d 1285, 1292 (10th Cir. 1999). In the case before us, however, the majority barely

acknowledges this aspect of our caselaw. Indeed, it never considers whether excluding

Sherwood was "too severe" a sanction or whether this is the "rare" case in which

exclusion is warranted. Instead, it relies upon the dissent in *Gonzales* that rejected such

an analysis and emphasized that "[t]he question before [us] . . . is not whether

[exclusion] . . . was the remedy we would have chosen, or even whether we think

[exclusion] . . . is unduly harsh." *Id.* at 1294 (McKay, J., concurring in part and

dissenting in part) (disagreeing with majority's conclusion that the district court abused

its discretion in excluding witness); *see* maj. op. at 15. But assessing whether a sanction

is unduly harsh is precisely the inquiry that our precedent requires. *See Gonzales*, 164

F.3d at 1292 (majority opinion). Because I would apply our governing precedent and

find that that this is not a "rare" case and that exclusion was "too severe" a sanction under

the circumstances, I respectfully dissent.

As the majority points out, the district court's decision to exclude Sherwood is subject to abuse of discretion review. Maj. op. at 4. In the context of the exclusion of witness testimony, however, we have significantly cabined that discretion. As we stated in *Golyansky*,

> In the absence of a finding of bad faith, the court should impose the least severe sanction that will accomplish prompt and full compliance with the discovery order. The preferred sanction is a continuance. *It would be a rare case where, absent bad faith, a district should exclude evidence rather than continue the proceedings.*

291 F.3d at 1249 (emphasis added) (citations omitted). As we have recognized, exclusion of a witness is "almost never imposed in the absence of a constitutional violation or statutory authority for such exclusion." *United States v. Charley*, 189 F.3d 1251, 1262 (10th Cir. 1999) (quotations omitted). In deciding whether exclusion is "the least severe sanction" sufficient to address the violation, *Golyansky*, 291 F.3d at 1249, the district court should consider three factors: (1) the reason for the delay; (2) the extent of the prejudice to the party seeking disclosure; and (3) the feasibility of curing the prejudice with a continuance, *see* maj. op. at 4–5 (citing *United States v. Banks*, 761 F.3d 1163, 1198–99 (10th Cir. 2014)); *see also Gonzales*, 164 F.3d at 1292 (considering these factors and concluding that exclusion was "too severe" a sanction and remanding for "consideration of less severe sanctions").

Here, it is undisputed that the failure to list Sherwood as a witness was not motivated by bad faith. Maj. op. at 5. Therefore, the question is whether this was the "rare case" in which exclusion was necessary. I believe the answer to that question is no.

2

First, the prejudice to Moya was relatively small.  As the majority acknowledges,

Sherwood's toxicology report was provided to Moya over a year before trial.  Maj. op. at

7.  Further, Moya retained two experts to challenge Sherwood's findings.  App. vol. 1,

190–99 (Dr. Steven Pike); App. vol. 2, 297–307 (Janine Arvizu).  Both of these experts

challenged Sherwood's findings in their own reports.  App. vol. 1, 190–99; App. vol. 2,

297–307.  Moreover, Moya listed Sherwood on his list of potential witnesses (later

deleting her once the government filed an emergency motion to add her to its list).

*Compare* App. vol. 1, 187–88 (amended witness list; including Sherwood), *with id.* at

230–31 (second amended witness list; omitting Sherwood).  Moya was thus not only

familiar with Sherwood's toxicology report, he had retained two experts to take issue

with it and had listed her as a potential witness.  Under these circumstances, it is difficult

to say that the prejudice of nondisclosure was substantial or that Moya would have

needed significant time to prepare for cross-examining Sherwood.  This case is thus

analogous to *Charley* where we concluded that, although some witnesses had been

mislabeled fact witnesses instead of expert witnesses, the defendant did not "suffer[] any

prejudice" because the "government turned over to the defense copies of all . . . records

from which the witnesses would be testifying."  189 F.3d at 1262.[1]

---

[1] The majority distinguishes *Charley* on the ground that, "unlike the government in this
case, the government in *Charley* timely notified the defense that it would call certain
witnesses.  It merely failed to provide summaries of their planned testimony . . . .  Thus,
the defendant in *Charley* knew that certain witnesses would testify on behalf of the
government."  Maj. op. at 8.  I disagree with the majority's reading of *Charley*, as the
government in that case had not designated the witnesses as *experts*.  *See* 189 F.3d at
1257 ("Well before trial in this case, the government notified defense counsel that it

3

Second, the feasibility of a continuance was not properly considered by the district court. The district court noted that the case had been continued "multiple times" already. App. vol. 2, 312. Indeed, Moya received at least four continuances so that he could retain experts to challenge Sherwood. *See* App. vol. 1, 121–59, 164–65, 205–23. However, the district court did not explore the feasibility of a continuance. The court noted that that the government "would acquiesce if [Moya] requested a continuance" so that Sherwood could testify, but explained that "[Moya] expressed a clear desire to proceed with the trial as scheduled because it would be quite a challenge to reschedule all the defense witnesses." App. vol. 2, 312. The court went on to find that it would not grant a continuance because "both parties expressed that they did not want a continuance and [because of] the difficulties inherent in rescheduling the case, along with the Court's own docket." *Id.*

But the district court's suggestion that the government "did not want a continuance" is inaccurate.[2] The government's position was that it did not believe a

would call as witnesses certain health care professionals . . . . However, *it did not designate any of these witnesses as experts* and, accordingly, did not provide defense counsel with any summaries of expert witness testimony . . . ." (emphasis added)). The case before us is actually a weaker case for exclusion: Not only was Moya aware of the witness, as in *Charley*, but he also knew what the witness would say since he had had Sherwood's report for over a year.

[2] The majority suggests that the government "never argues that the district court relied on an erroneous factual finding when [evaluating the feasibility of a continuance]." Maj. op. at 11 n.4. The majority's suggestion overlooks the government's vigorous argument that the district court's "analysis [of this factor was] insufficient." Aplt. Br. at 24 (calling to the court's attention the district court's conclusion that neither side "want[ed] a continuance" and contending that the district court's analysis was "insufficient").

4

continuance was necessary given Moya's possession of Sherwood's report, his retention of two witnesses to challenge that report, and the fact that Sherwood had appeared on his witness list. *See* App. vol. 3 at 407–11; App. vol. 1, 187–88. But there is nothing in the record to suggest that the government preferred exclusion over a continuance if faced with the possibility that Sherwood would not be permitted to testify. Indeed, the government was prepared to accept a continuance if one was necessary to allow Moya to prepare for Sherwood's testimony. Thus, the district court excluded Sherwood's testimony on the ground, not supported by the record, that the government opposed a continuance. The absence of record support for the district court's conclusion in this regard constitutes an abuse of discretion. *See Gonzales*, 164 F.3d at 1292 (concluding that the district court had abused its discretion in ordering exclusion where there was "no record support whatsoever" for the court's conclusion that a continuance could not cure prejudice to defendants). Stated differently, the district court abused its discretion in this case by not considering whether a continuance could cure any prejudice caused by the government's failure to timely disclose Sherwood. The most that can be said about the district court's assessment of this factor is that it would have been inconvenient to reschedule the trial. Maj. op. at 8 (noting that the district court mentioned its own "docket and scheduling limitations").

More fundamentally, there is nothing in the record to support a finding that this was the "rare" case in which exclusion was a necessary remedy. I do not take issue with

5

the majority's conclusion that there was at least some prejudice to Moya due to the government's failure to timely list Sherwood, and at least some difficulty in rescheduling the trial. Maj. op. at 8, 10, 14. But this would be true in virtually any case involving a discovery violation. The question here is whether this is the "rare" case where a continuance would not be the proper remedy. There is nothing in the record in my view that sets this case apart so as to justify exclusion.

The most troubling aspect of the majority's opinion is its failure to recognize that exclusion is to be the "rare" remedy. As we explained in *Gonzales*,

> we emphasize the Supreme Court has never approved exclusion of evidence as a sanction for government misconduct in the absence of a constitutional violation or statutory authority for such exclusion. Indeed, the Court has emphasized that penalties visited upon the Government, and in turn upon the public, because its officers have violated the law must bear some relation to the purposes which the law is to serve. Here, we are convinced the sanction of total exclusion is too severe and hinders, rather than forwards, the public interest in a full and truthful disclosure of critical facts.

164 F.3d at 1292 (citations and quotations omitted). As noted above, the majority not only overlooks this caselaw, but relies on the dissent in *Gonzales* that rejected such an analysis and emphasized that "[t]he question before [us] . . . is not whether [exclusion] . . . was the remedy we would have chosen, or even whether we think [exclusion] . . . is unduly harsh." *Gonzales*, 164 F.3d at 1294 (McKay, J., concurring in part and dissenting in part) (disagreeing with majority's conclusion that the district court abused its discretion in excluding witness); *see* maj. op. at 15. But according to the *Gonzales* majority opinion, we must assess whether the sanction is too severe. 164 F.3d at 1292–93 (finding exclusion to be "too severe" of a sanction and remanding the case to the

6

district court for "less severe sanctions"). Here, that inquiry into whether exclusion was necessary is an easy one because there is nothing in the record to suggest that a brief continuance would not have cured any prejudice to Moya, or even that a continuance was necessary.

In the end, the majority's basic error, in my view, is to apply an abuse of discretion standard without any recognition that the discretion has been limited. The majority states that "[u]nder this deferential standard of review, 'we will not disturb the ruling unless it is arbitrary, capricious, whimsical[,] or manifestly unreasonable, or we are convinced that the district court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.'" Maj. op. at 4 (second alteration in original) (quoting *United States v. Banks*, 761 F.3d 1163, 1197 (10th Cir. 2014));[3] *see also* maj. op. at 15 (same). Here, I agree with the majority that the district court's decision was not arbitrary, capricious, whimsical, or manifestly unreasonable. It did, however, make a decision that was outside the bounds of permissible choice because our caselaw obliges the court to select "the least severe sanction that will accomplish prompt and full compliance with the discovery order." *Golyansky*, 291 F.3d at 1249.

---

[3] To the extent that the majority relies on *Banks*, *see* maj. op. at 14–15, that reliance is misplaced.

In *Banks*, the defendants attempted to call three undisclosed expert witnesses on the ninth day of trial and after the close of the government's case. 761 F.3d at 1197–99. The district court permitted one undisclosed expert to testify because the "exclusion of evidence for violating discovery orders should not be done lightly," but excluded the other two undisclosed defense experts. *Id.* at 1198 (citation omitted). On appeal, we upheld that exclusion order because *Banks* is indeed the rare case. *Id.*

7

Because I would reverse on the ground that the district court abused its discretion in excluding Sherwood's testimony, I do not need to reach the government's second ground for appeal, namely, whether Labay's testimony would violate the Confrontation Clause. I therefore express no view on that issue. For the reasons stated above, I respectfully dissent.